RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 15a0134p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

SOARING EAGLE CASINO AND RESORT, an Enterprise of the Saginaw Chippewa Indian Tribe of Michigan,
           *Petitioner/Cross-Respondent*,

           *v.*

NATIONAL LABOR RELATIONS BOARD,
           *Respondent/Cross-Petitioner*.

Nos. 14-2405/2558

On Petition for Review and Cross-Application for Enforcement
of an Order of the National Labor Relations Board.
No.  07-CA-053586.

Argued:  April 29, 2015

Decided and Filed:  July 1, 2015

Before:  WHITE, DONALD, and O'MALLEY,[*] Circuit Judges.

_____

## COUNSEL

**ARGUED:**  William A. Szotkowski, HOGEN ADAMS PLLC, St. Paul, Minnesota, for Petitioner/Cross-Respondent.  Kira D. Vol, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Respondent/Cross-Petitioner.  **ON BRIEF:**  William A. Szotkowski, Jessica Intermill, HOGEN ADAMS PLLC, St. Paul, Minnesota, Sean Reed, SAGINAW CHIPPEWA INDIAN TRIBE, Mt. Pleasant, Michigan, for Petitioner/Cross-Respondent.  Kira D. Vol, Linda, Dreeben, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Respondent/Cross-Petitioner.   Jennifer H. Weddle, Tory A. Eid, Maranda S. Compton, GREENBERG TRAURIG, LLP, Denver, Colorado, Alan E. Schoenfeld, WILMER CUTLER PICKERING HALE AND DORR LLP, New York, New York, Sarah Krakoff, UNIVERSITY OF COLORADO LAW SCHOOL, Boulder, Colorado, Lloyd B. Miller, SONOSKY, CHAMBERS, SACHSE, ENDRESON & PERRY, LLP, Washington, D.C., for Amici Curiae.

_____

[*]The Honorable Kathleen M. O'Malley, Circuit Judge for the United States Court of Appeals for the Federal Circuit, sitting by designation.

1

O'MALLEY, J., delivered the opinion of the court which DONALD, J., joined, and WHITE, J., joined in all but section III(B). WHITE, J. (pp. 35–37), delivered a separate opinion concurring in part and dissenting in part.

———————————

**OPINION**

———————————

KATHLEEN M. O'MALLEY, Circuit Judge.  This case involves the scope of the National Labor Relations Board's ("Board") jurisdiction over an Indian tribe's operation of a casino on reservation land.  The Soaring Eagle Casino & Resort ("Casino"), owned and operated by the Saginaw Chippewa Indian Tribe of Michigan ("the Tribe"), discharged Susan Lewis for violating the Casino's no-solicitation policy.  The Board found that the Casino's no-solicitation policy violated sections 8(a)(1) and 8(a)(3) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 151 *et seq.*, and ordered the Casino to cease and desist from maintaining a no-solicitation rule and to reinstate Susan Lewis to her former position with back pay and benefits.  For the following reasons, we **ENTER JUDGMENT ENFORCING** the Board's Decision and Order, finding that the Board has jurisdiction over the Casino's employment practices.

I

A

The Tribe is a federally recognized Indian tribe located in Mount Pleasant, Michigan. *See* Indian Entities Recognized and Eligible to Receive Services from the United States Bureau of Indian Affairs, 80 Fed. Reg. 1942–02 (Jan. 14, 2015); *Soaring Eagle Casino & Resort*, 359 NLRB 92, 2013 WL 1646049, at *4 (2013).  The Tribe is a successor to two treaties between the United States of America and the Chippewa Indians of Saginaw, Swan Creek, and Black River, Michigan, one in 1855 and one in 1864.  *See* 14 Stat. 657 (1864); 11 Stat. 633 (1855).  The 1855 Treaty involved a land swap—including land in Isabella County, Michigan—between the United States and the Indian tribes, liability releases by the tribes, and support payments from the United States to the tribes for a variety of purposes.  11 Stat. 633.  The 1864 Treaty included the release (to the United States) of some of the property reserved to the tribes in the 1855 Treaty, but, as relevant to the present dispute, also included an agreement by

the United States to "set apart for the exclusive use, ownership, and occupancy [by the Tribe]" property in Isabella County as a reservation.  14 Stat. 657.  It is undisputed that the Treaties preserved the Tribe's right to exclude non-Indians from living in the territory.  *Soaring Eagle*, 2013 WL 1656049, at *4 & n.5.  Unsurprisingly, considering the date of the Treaties—in an era before the creation of a federal regulatory structure—the Treaties did not mention application of federal regulations to members of the Tribe or to the Tribe itself.

The property reserved for the "exclusive use, ownership, and occupancy" of the Tribe eventually became the Isabella Reservation, located within Isabella County and Arenac County in central Michigan.  *Id.* at *5.  The Tribe has over 3,000 members, and is governed by a twelve-person tribal council which is elected by the Tribe.  *Id.*  The tribal council enacts laws applicable to tribal members, and manages economic development for the Tribe.  *Id.*  In 1993, under the Indian Gaming Regulatory Act, 25 U.S.C. § 2701 *et seq*. (2012) ("IGRA"), the Tribe and the State of Michigan entered a compact, subsequently approved by the United States, that allowed the Tribe to conduct gaming enterprises on the Isabella reservation.  *Id.*  The Tribe opened the Casino on land held in trust for the Tribe by the United States.[1]  *Id.*  The Tribe enacted its own gaming code to regulate internal controls and licensing criteria for employees.  *Id.*  The Tribe also created a regulatory body, the Tribal Gaming Commission, to enforce the gaming code.  *Id.*

On November 16, 1993, the Tribe established Soaring Eagle Gaming as a subdivision of the tribal government chartered to operate and manage the Casino.  *Id.*  The tribal council hires all management-level employees for the Casino, requires frequent reports from managers on the Casino's performance, and approves contracts with outside vendors.  *Id.*  The tribal council also decides how to distribute the Casino's revenue for tribal functions.  *Id.*  The Casino is situated on land held in trust for the Tribe by the United States.

---

[1]Under the General Allotment Act of 1887, ch. 119, 24 Stat. 388, and the Crow Allotment Act of 1920, ch. 224, 41 Stat. 751, reservation land can fall into three categories:  trust land; land held in fee by individual tribe members; and land held in fee by nonmembers.  All reservation land originally was held in trust for the tribe. Individual tribe members, upon satisfaction of certain conditions, could also receive patents in fee for property within the reservation.  After holding the fee land for twenty-five years, the member allottees could then alienate the land to nonmembers.  *See Montana v. United States*, 450 U.S. 544, 548 (1981).  As discussed later, the manner in which the reservation land is held has legal significance.  *See, e.g.*, *Plains Commerce Bank v. Long Family Land & Cattle Co.*, 554 U.S. 316, 329 (2008) ("[W]hen the tribe or tribal members convey a parcel of fee land *to non-Indians*, [the tribe] loses any former right of absolute and exclusive use and occupation of the conveyed lands.  This necessarily entails the loss of regulatory jurisdiction over the use of the land by others." (internal citations and quotation marks omitted) (second alteration in original)).

Of the Casino's approximately 3,000 employees, 7% are members of the Tribe, as are 30% of all management-level employees. *Id*. at *6. The Casino generates approximately $250 million in gross annual revenues and attracts over 20,000 customers per year, many of whom are not members of the Tribe. *Id.* The Casino advertises using billboards, newspapers, radio, and television, and competes with privately-owned casinos throughout Michigan. *Id.* The revenues from the Casino constitute almost 90% of the Tribe's income, providing the vast majority of funding necessary to run the Tribe's 37 departments and 159 programs. *Id.* These programs and departments provide for health administration, social services, tribal police and fire departments, utilities, a tribal court system, and education for members of the Tribe. *Id.* The operation of the Casino allows the Tribe to provide many services previously not available to its members because it lacks access to exploitable natural resources and has an insufficient tax base.

Portions of the Tribe's gaming code relevant to employee conduct are contained in the Soaring Eagle Casino & Resort Associate Handbook ("Handbook"). Section 5.3 of the Handbook, approved by the tribal council on October 13, 2006, includes a no-solicitation policy that prevents any solicitation by employees, including solicitation related to union activities, on Casino property. The Handbook defines "Solicitation" as:

> [A]ny verbal or written communication and the distribution or emails, circulars, handbills or other documents/literature of any kind by any employee or group of employees to another employee or group of employees that encourages, advocates, demands, or requests a contribution of money, time, effort, personal involvement, or membership in any fund . . . or labor organization of any kind or type . . . .

Section 5.3 prohibits, *inter alia*, the following actions:

> 2. Employees are prohibited from soliciting in any work area. Employees are also prohibited from soliciting during their assigned working time or soliciting other employees during their assigned working time. . . .
>
> 3. Employees are prohibited from posting notices, photographs, or other written materials on bulletin boards or any other Soaring Eagle premises.

The Handbook further provides that "[a]ny person violating this policy will be subject to disciplinary action up to, and including, termination."

B

Susan Lewis, who is not a member of the Tribe, was intermittently employed as a housekeeper at the Casino beginning on July 13, 1998. *Soaring Eagle*, 2013 WL 1656049, at \*8. On September 29, 2009, Lewis engaged in union solicitation activities on behalf of the International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America ("the Union"). *Id.* Lewis's supervisors warned her that such activities violated the Handbook, and informed her that further solicitation could lead to adverse employment actions. *Id.* Lewis nevertheless again engaged in solicitation activities on August 25, 2010. This time, Lewis received a written notice informing her of the violation and cautioning her that she could not engage other employees in discussions about union activities. *Id.* Management later observed Lewis handing out wrist bands stating "BAND TOGETHER 2010" to other housekeepers on October 4, 2010. *Id.* The Casino then suspended Lewis. *Id.*

When Lewis returned to work after her suspension, she again engaged another housekeeper in a discussion about the Union while Lewis and the housekeeper were working. *Id.* at \*9. On November 15, 2010, the Casino discharged Lewis for engaging in union solicitation activities in violation of the no-solicitation policy. *Id.*

C

The Union filed a charge with the Board on April 1, 2011, and the General Counsel for the Board issued an amended complaint on October 12, 2011. The Union alleged that the Tribe violated § 8(a)(1) of the NLRA, 29 U.S.C. § 158(a)(1),[2] by having a no-solicitation policy and banning employee discussion of union activities, and §§ 8(a)(1),(3),[3] 29 U.S.C. §§ 158(a)(1),(3), by suspending and terminating Lewis for engaging in union solicitation activities. *Soaring Eagle*, 2013 WL 1656049, at \*4. The Tribe filed its response, contending that the NLRA did not apply to the Tribe's activities as a sovereign, and the Board subsequently held a hearing regarding the Tribe's liability. *Id.*

---

[2] 29 U.S.C. § 158(a)(1)—"It shall be an unfair labor practice for an employer—(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title[.]"

[3] 29 U.S.C. § 158(a)(3)—"It shall be an unfair labor practice for an employer—(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization . . . ."

The Administrative Judge ("AJ") issued his decision and order on March 26, 2012, finding that the Board had jurisdiction over the Casino and Tribe and that the Tribe violated the NLRA.  Citing the Board's holding in *San Manuel Indian Bingo & Casino*, 341 NLRB 1055 (2004) (adopting in part the Ninth Circuit's framework in *Donovan v. Coeur d'Alene Tribal Farm*, 751 F.2d 1113 (9th Cir. 1985)), *aff'd sub nom. San Manuel Indian Bingo & Casino v. NLRB*, 475 F.3d 1306 (D.C. Cir. 2007), the AJ determined that the Board had jurisdiction over the Tribe and the Casino.  *Soaring Eagle*, 2013 WL 1656049, at *9–13.  In particular, the AJ found that: (1) restricting operations at a casino on reservation land does not interfere with the Tribe's right of self-governance; (2) the 1855 and 1864 Treaties only provide for a general right of exclusion, which is insufficient to bar application of an act of general applicability like the NLRA; and (3) nothing in the language of the NLRA or its legislative history shows a congressional intent to exclude Indians from its coverage.  *Id.*  The AJ then concluded that "the Tribe is an employer engaged in commerce within the meaning of Section 2(2), (6) and (7) of the [NLRA]."  *Id.* at *13.  Turning to the merits of the complaint, the AJ found that the no-solicitation policy and the ban on discussions among employees about union activity on Casino property violates § 8(a)(1) of the NLRA, and Lewis's suspension and discharge violated §§ 8(a)(1),(3) of the NLRA.[4]  *Id.* at *14–18.  The AJ ordered the Tribe to cease and desist its practices involving the no-solicitation policy, and to reinstate Lewis with appropriate back pay and benefits.  *Id.* at *18–19.

The Tribe appealed the initial decision to the Board, and a three member panel consisting of Chairman Gaston Pearce and Members Richard Griffin and Sharon Block affirmed the AJ's "rulings, findings, and conclusions," and adopted the Order with minor modifications.[5]  *Id.* at *1 (footnote omitted).  The Tribe appealed to this Court, requesting that we reverse the Board's jurisdictional analysis, but not challenging the underlying merits decision.  On the day of oral argument, however, the Supreme Court issued its decision in *NLRB v. Noel Canning*, 134 S. Ct. 2550 (2014), holding that certain of President Obama's recess appointments to the Board,

---

[4]According to the AJ, "the Tribe did not refute the testimony and other evidence regarding the merits of the unfair labor practice charges."  *Id.* at *13.

[5]The Board "modified the Order and notice to conform to the violations found and to include a remedial provision regarding the tax and social security consequences of making discriminatee Susan Lewis whole . . . ."  *Id.* at *1 n.3.

including the appointments of Members Griffin and Block, were unconstitutional.  At the request of the parties, we delayed oral argument to allow the parties to determine how best to proceed in light of the *Noel Canning* decision.  The Board moved to vacate its Order and remand for further consideration.  We granted the Board's motion, vacated its initial order, and remanded for further consideration.  Order, *Saginaw Chippewa Indian Tribe of Mich. v. NLRB*, Nos. 13-1569, -1629 (6th Cir. Aug. 6, 2014), ECF No. 91.  On remand, the Board, consisting of Members Philip Miscimarra, Kent Hirozawa, and Nancy Schiffer, "considered de novo the judge's decision and the record . . . . [and] the now-vacated Decision and Order, and [agreed] with the rationale set forth therein." *Soaring Eagle Casino & Resort*, 361 NLRB 73, 2014 WL 5426873, at *1 (2014).  The Board again adopted the AJ's Decision and Order with minor modifications, and the Tribe again appealed.

We have jurisdiction over the appeal under 29 U.S.C. § 160(f) (2012).

II

We apply the two-step test of *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43 (1984), to the Board's interpretation of the NLRA.  *NLRB v. Webcor Packaging, Inc.*, 118 F.3d 1115, 1119 (6th Cir. 1997) (citing *Holly Farms Corp. v. NLRB*, 517 U.S. 392, 409 (1996)).  Under *Chevron*, we first determine "whether Congress has directly spoken to the precise question at issue."  467 U.S. at 842.  If Congress has spoken directly on the issue, we give effect to that "expression of congressional will." *Painting Co. v. NLRB*, 298 F.3d 492, 499 (6th Cir. 2002); *see also Chevron*, 467 U.S. 842–43.  If Congress has not directly spoken on the question at issue, we "review[] the Board's decision solely to assess whether the Board's interpretation is based on a permissible interpretation of the statute." *Painting Co.*, 298 F.3d at 499.  "For the Board to prevail, it need not show that its construction is the best way to read the statute; rather, courts must respect the Board's judgment so long as its reading is a reasonable one." *Holly Farms*, 517 U.S. at 409 (emphasis omitted).  And, under the Supreme Court's recent decision in *City of Arlington  v. FCC*, 133 S. Ct. 1863, 1868 (2013), we apply *Chevron* deference to an agency's interpretation of its own jurisdiction because "the distinction between 'jurisdictional' and 'nonjurisdictional' interpretations is a mirage."

We, however, review the Board's interpretation of federal Indian law de novo. *See, e.g.*, *Painting Co.*, 298 F.3d at 500 ("[T]his Circuit's historical *de novo* review remains in force for the Board's legal conclusions that do not interpret the NLRA."). We do not defer "to the Board's remedial preferences where such preferences potentially trench upon federal statutes and policies unrelated to the NLRA." *Hoffman Plastic Compounds, Inc. v. NLRB*, 535 U.S. 137, 144 (2002). As the D.C. Circuit has noted in considering the application of the NLRA to Indian tribes, "[b]ecause the Board's expertise and delegated authority does not relate to federal Indian law, we need not defer to the Board's conclusion[s]." *San Manuel*, 475 F.3d at 1312. We therefore analyze de novo if the 1855 and 1864 Treaties, or the Tribe's inherent sovereignty rights, prevent application of the NLRA to the Casino. *See id.* ("Therefore, we decide de novo the implications of tribal sovereignty on the statutory construction question before us."). Only if we determine that neither the Treaties nor inherent sovereignty rights prohibit application of the NLRA in these circumstances must we then perform the *Chevron* analysis for the Board's interpretation of § 152(2).

## III

We must first decide if the Casino is subject to the NLRA. The Tribe does not dispute that, if it is subject to the Act, its no-solicitation policies and treatment of Lewis would violate provisions in Section 8 of the Act. We thus determine only whether the 1855 and 1864 Treaties, or federal Indian law and policies, prevent application of the NLRA to a tribal-owned casino operated on trust land within a reservation, and, if not, whether the Board's interpretation of "employer" in 29 U.S.C. § 152(2)[6] to include the Casino is a "reasonable one." *Holly Farms*, 517 U.S. at 409.

## A

The Tribe first argues that the language of the 1855 and 1864 Treaties prevent application of the NLRA to the Casino's activities. The Tribe claims that certain Indian law canons of

---

[6] "The term 'employer' includes any person acting as an agent of an employer, directly or indirectly, but shall not include the United States or any wholly owned Government corporation, or any Federal Reserve Bank, or any State or political subdivision thereof, or any person subject to the Railway Labor Act, as amended from time to time, or any labor organization (other than when acting as an employer), or anyone acting in the capacity of officer or agent of such labor organization." 29 U.S.C. § 152(2).

construction require that we read the Treaties to bar enforcement of the Act on tribal properties. These canons include: (1) "[h]ow the words of the treaty were understood by [the Indians], rather than their critical meaning, should form the rule of construction," *Worcester v. Georgia*, 31 U.S. (6 Pet.) 515, 582 (1832); (2) "the language used in treaties with the Indians *shall never be construed to their prejudice,* if words be made use of which are susceptible of a more extended meaning than their plain import as connected with the tenor of their treaty," *Keweenaw Bay Indian Community v. Naftaly*, 452 F.3d 514, 523 (6th Cir. 2006) (quoting *In re Kansas Indians*, 72 U.S. (5 Wall.) 737, 760 (1866)); and (3) "Congress may abrogate Indian treaty rights, but it must clearly express its intent to do so," *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 202 (1999). Amici also point us towards other canons of construction supporting broad tribal rights, including that "statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit," *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766 (1985), and that "a proper respect both for tribal sovereignty itself and for the plenary authority of Congress in th[e] area [of Indian affairs] cautions that [courts] tread lightly in the absence of clear indications of legislative intent," *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 149 (1982) (quoting *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 60 (1978)). *See, e.g.*, Brief for the National Congress of American Indians as Amicus Curiae in Support of Petitioner at 5, *Saginaw Chippewa Indian Tribe of Michigan v. NLRB* (6th Cir. 2015) (Nos. 14-2405, -2558).

Next, the Tribe argues that the Casino represents a traditional governmental function, noting that the Supreme Court has recognized previously that tribal gaming forms a central aspect of tribal governance because of its ability to raise needed revenue for tribes. The Tribe claims that, because the Saginaw Tribe believed in 1855 and 1864 that the Treaties would protect the reservation property from government intrusion in perpetuity, the treaties should be interpreted accordingly. The Tribe further argues that the general right to exclude described in the language of the 1864 Treaty includes the lesser right to condition entry onto reservation property by nonmembers of the Tribe. The no-solicitation policy, according to the Tribe, represents a reasonable assertion of its right to condition entry onto reservation property, and the NLRA contains no express abrogation of that treaty right.

The Board responds that many of the canons of construction noted by the Tribe and Amici are irrelevant to interpretation of the NLRA, which is not a law explicitly directed at Indian affairs. The Board argues that treaties do not create tribal powers, but merely preserve inherent sovereignty not ceded in the treaty. The Board further notes that the language of the 1864 Treaty describes, at best, a broad power to exclude, and not the sort of specific treaty right necessary to abrogate federal statutes of general applicability. And, the Board points to decisions of our sister circuits holding that broad descriptions of a power to exclude in a treaty are insufficient to bar application of generally applicable laws. The Board contends that, if we were to hold that a broad, general treaty right to exclude prevents application of the NLRA to tribal activities, there would be no logical limit to a tribe's use of such treaty language to preclude application of *all* non-specific federal laws on tribal land.

B

Although our analysis differs from that employed by the Board or urged by it on appeal, we ultimately agree with the Board that a general treaty right to exclude, such as the one described in the 1864 Treaty, alone is insufficient to prevent application of the NLRA to the Casino. We first consider the scope of the specific treaty rights at issue here. "[T]he starting point for any analysis of [rights granted by a treaty] is the treaty language itself. The Treaty must be interpreted in light of the parties' intentions, with any ambiguities resolved in favor of the Indians." *Mille Lacs*, 526 U.S. at 206. Once the scope of rights reserved by a treaty is determined, we look to see whether Congress intended to abrogate those rights. Congress has the power, as the higher sovereign, to abrogate Indian treaty rights, but "[t]here must be clear evidence that Congress actually considered the conflict between its intended action on the one hand and Indian treaty rights on the other, and chose to resolve that conflict by abrogating the treaty." *Id.* at 202–03 (citations and quotation marks omitted); *see also Santa Clara Pueblo*, 436 U.S. at 60 ("[A] proper respect both for tribal sovereignty itself and for the plenary authority of Congress in this area cautions that we tread lightly in the absence of clear indications of legislative intent."). "Congress . . . has the power to 'abrogate the provisions of an Indian treaty, though presumably such power will be exercised only when circumstances arise which will not only justify the government in disregarding the stipulations of the treaty, but may demand, in the

interest of the country and the Indians themselves, that it should do so.'" *United States v. Dion*, 476 U.S. 734, 738 (1986) (quoting *Lone Wolf v. Hitchcock*, 187 U.S. 553, 566 (1903)).

The Supreme Court demands a clear statement of intent for the abrogation of Indian treaty rights. *Id.* at 739–40; *see also South Dakota v. Bourland*, 508 U.S. 679, 687 (1993) ("Congress has the power to abrogate Indians' treaty rights . . . though we usually insist that Congress clearly express its intent to do so." (internal citations omitted)).[7]

The Board argues that this analysis is unnecessary because "a general statute in terms applying to all persons includes Indians and their property interests," citing to the Supreme Court's statement to that effect in *Federal Power Commission v. Tuscarora Indian Nation*, 362 U.S. 99, 116 (1960). According to the Board, when Congress passes a law of general applicability, no further inquiry into its intent with respect to tribal activities on reservation land is either necessary or appropriate. As other circuits have recognized, however, this language in *Tuscarora* does not require application of a general regulatory statute to tribal activities if doing so would be in derogation of explicit treaty rights. *See, e.g.*, *Donovan v. Navajo Forest Prods. Indus.*, 692 F.2d 709, 711 (10th Cir. 1982) ("*Tuscarora* did not, however, involve an Indian treaty. . . . The *Tuscarora* rule does not apply to Indians if the application of the general statute would be in derogation of the Indians' treaty rights."); *see also Tuscarora*, 362 U.S. at 124 (holding that application of "the Federal Power Act, to take such of the lands of the Tuscaroras as are needed for the Niagara project do not breach the faith of the United States, or any treaty . . . of the United States with the Tuscarora Indian Nation . . . .").

In *Mille Lacs*, for instance, the treaty at issue guaranteed to the Chippewa Tribe the "privilege of hunting, fishing, and gathering the wild rice, upon the lands, the rivers and the lakes included in the territory ceded." 526 U.S. at 177 (quoting 1837 Treaty with the Chippewa, 7 Stat. 536). In an 1842 treaty, the Chippewa then ceded additional land to the government in

---

[7]We analyze these treaty rights separately from our analysis of the inherent rights of sovereignty retained by the tribes. *Strate v. A-1 Contractors*, 520 U.S. 438, 449 (1997) ("As the Court made plain in *Montana* [*v. United States*, 450 U.S. 544 (1981)], the general rule and exceptions there announced govern only in the absence of a delegation of tribal authority by treaty or statute.").

exchange for usufructuary rights.[8]  *Id.*  When the state of Minnesota sought to enforce its hunting laws on reservation land in the 1990's, the tribe sought a declaratory judgment against the state that, among other things, the tribe retained its usufructuary rights despite Minnesota's admission to the Union.  *Id.* at 185.  The Supreme Court concluded that the statute admitting Minnesota to the Union, which was silent regarding Indian rights, failed to abrogate the Chippewa's usufructuary rights.  *Id.* at 202–06.  Because the Act "makes no mention of Indian treaty rights[,] it provides no clue that Congress considered the reserved rights of the Chippewa and decided to abrogate those rights when it passed the Act."  *Id.* at 203.  The Court made clear that Congress must speak directly when intending to abrogate explicit grants of rights to Indian tribes in treaties.  *Id.*; *see also Bourland*, 508 U.S. at 689–93 (stating that, with regard to a "right of absolute and exclusive use and occupation" of land described in the language of a treaty, "Congress'[s] explicit reservation of certain rights in the taken area does not operate as an implicit reservation of all former rights.").

We, thus, reject the Board's invitation to ignore the second step of the treaty analysis simply because the NLRA is a statute of general applicability.  Turning to the question of congressional intent, both the Board and the Tribe agree that the NLRA is entirely silent with respect to Indians and Indian tribes.  The Board also fails to point to any other act of Congress, or even any legislative history, that would demonstrate Congress's intent to abrogate the rights established by the 1855 and 1864 Treaties.  Because Congress did not abrogate the terms of those Treaties, the Board cannot rely on abrogation principles to avoid any rights granted in the Treaties.  We thus turn to the Treaties to determine what rights were reserved.

The Tribe contends that the right to exclude in the Treaties unambiguously gives it authority to condition the activities of nonmembers on the reservation.  There is substantial authority for that proposition.  "Nonmembers who lawfully enter tribal lands remain subject to the tribe's power to exclude them.  This power necessarily includes the lesser power to place conditions on entry, on continued presence, or on reservation conduct . . . ."  *Merrion*, 455 U.S. at 144; *cf. Bourland*, 508 U.S. at 687–88 (interpreting the "unqualified right of 'absolute and

---

[8]Usufructuary rights are "right[s] for a certain period to use and enjoy the fruits of another's property without damaging or diminishing it, but allowing for any natural deterioration in the property over time."  Black's Law Dictionary 1778 (10th ed. 2014).

undisturbed use and occupation' of [ ] reservation lands" recognized in a treaty as "embracing the implicit 'power to exclude others'" and including "the authority to control fishing and hunting on those lands." (internal citation omitted)); *Montana v. United States*, 450 U.S. 544, 559 (1981) (same). The Board concedes that—if we reject its argument that treaty rights may be impliedly rejected by the mere passage of a statute of general applicability—detailed and specific treaty language may be enough to reserve to a Tribe the type of authority the Tribe here asserts. The Board contends, however, that the broad, non-specific language of the Treaties at issue is insufficient to bar application of the NLRA to the Casino.

The Supreme Court has not addressed the precise argument the Board presses here. In cases analyzing the extent to which Indian treaty rights have been abrogated, the Court was either faced with circumstances where it found a clear intent by Congress to abrogate whatever rights to exclusion were in the treaties at issue, or considered language discussing very specific tribal rights and activity. *Compare Mille Lacs*, 526 U.S. at 196–201 (upholding the Tribe's specific usufructuary treaty rights absent clear statements by Congress abrogating those rights), *with Bourland*, 508 U.S. at 689–91 (finding that the specific language in the Flood Control Act of 1944 and the Cheyenne River Act of 1954 abrogated explicit treaty rights to exclude by opening the tribal land at issue for public use), *Brendale v. Confederated Tribes & Bands of Yakima Indian Nation*, 492 U.S. 408, 421–25 (1989) (opinion announcing in part judgment of the court) (concluding that a treaty granting reservation property to the Yakima Indian Nation for its "exclusive use and benefit" was abrogated by the Indian General Allotment Act, such that the Yakima Indian Nation no longer retained the power to zone property held in fee by nonmembers on the reservation), *and Dion*, 476 U.S. at 738–39 (finding that Congress abrogated the Yankton Sioux Tribe's treaty right of exclusive control over hunting and fishing on tribal land because Congress expressed, through the Bald Eagle Protection Act, a "clear and plain intent" to negate certain aspects of those rights).

Other circuits have addressed the issue, however. In *Donovan v. Navajo Forest Products Industries*, the Tenth Circuit analyzed whether a treaty providing that "no persons except those herein so authorized to do, and except such officers, soldiers, agents and employees of the government . . . as may be authorized . . . shall ever be permitted to pass over, settle upon, or

reside in, the territory described in this article," prevented application of the Occupational Safety and Health Act ("OSHA") against tribal business enterprises operating on a reservation. 692 F.2d at 710–11; *see also EEOC v. Cherokee Nation*, 871 F.2d 937, 938–39 (10th Cir. 1989) (relying on the analysis in *Navajo Forest Products* to conclude that the Age Discrimination in Employment Act did not apply to tribal business enterprise operating on a reservation in light of treaty language). Based on the language of the treaty, providing for specific exclusion rights over all persons, the Tenth Circuit refused to find that OSHA abrogated those rights where Congress had made no explicit statement in those acts limiting application of the treaty or overriding the tribe's retained inherent sovereignty rights. *Navajo Forest Prods.*, 692 F.2d at 711–12; *see also EEOC*, 871 F.2d at 938–39. The Tenth Circuit concluded that:

> Absent some expression of such legislative intent, however, we shall not permit divestiture of the tribal power to manage reservation lands so as to exclude non-Indians from entering thereon merely on the predicate that federal statutes of general application apply to Indians just as they do to all other persons (in this case 'employers') unless Indians are expressly excepted therefrom.

*Id.* at 714 (citing *Merrion*, 445 U.S. at 146–47); *Cherokee Nation*, 871 F.2d at 938–39 (finding no expression of congressional intent to limit tribe's treaty rights of exclusion in the ADEA).

Other circuits have reached the opposite conclusion in the face of less specific treaty language. The Seventh Circuit, in *Smart v. State Farm Insurance Co.*, concluded that ERISA applies to "employee benefits plan[s] established and operated by an Indian Tribe for Tribe employees," even in light of a treaty establishing "lands within the exclusive sovereignty of the [Tribe] under general federal supervision." 868 F.2d 929, 930, 934 (7th Cir. 1989) (internal quotation marks omitted) (second alteration in original). The Seventh Circuit distinguished the Tenth Circuit's analysis in *Navajo Forest Products*, on grounds that the *Navajo Forest Products* court had rejected application of OSHA to a tribal business because "a specific right would be compromised, *viz.*, the right to exclude unwanted federal OSHA inspectors." *Id.* at 935. The treaty at issue in *Smart*, on the other hand, did not "delineate specific rights in a manner comparable to the treaty in *Navajo Forest Products*," and simply conveyed land for the tribe's exclusive use. *Id.* Similarly, in *Menominee Tribal Enterprises v. Solis*, 601 F.3d 669 (7th Cir. 2010), the Seventh Circuit again found that a broad treaty right did not exempt a tribal business from the application of a federal regulatory statute, this time OSHA. The treaty at issue in

*Menominee Tribal Enterprises* stated, in regards to nonmember access to the reservation, that "all roads and highways, laid out by authority of law, shall have right of way through the lands of the said Indians on the same terms as are provided by law for their location through lands of citizens of the United States." *Id.* at 674. Comparing the language of that treaty to the more specific treaty in *Navajo Forest Products*, the court concluded that OSHA applied to the tribal business at issue. *Id.*

The Ninth Circuit has also considered the applicability of OSHA to a tribal enterprise in the face of broad treaty protections. *U.S. Dep't of Labor v. Occupational Safety & Health Review Comm'n*, 935 F.2d 182 (9th Cir. 1991) ("*US DOL*"). The Ninth Circuit found that treaty language, stating that "[a]ll of which tract shall be set apart . . . for their exclusive use; nor shall any white person be permitted to reside upon the same without the concurrent permission of the agent and superintendent," "sets forth a general right of exclusion." *Id.* at 184, 185. Based on its analysis of similar treaties in *United States v. Farris*, 624 F.2d 890 (9th Cir. 1980) (finding that the Organized Crime Control Act applied to tribal enterprises despite a treaty providing for a general right to exclude), and *Confederated Tribes of Warm Springs Reservation v. Kurtz*, 691 F.2d 878 (9th Cir. 1982) (finding that federal tax laws applied to a tribe despite a treaty providing for a general right to exclude), the Ninth Circuit concluded that a general right to exclude, even if ensconced in a treaty, did not "bar the enforcement of statutes of general applicability," absent a more direct conflict between the right of general exclusion and the entry necessary for enforcement of the statute. *USDOL*, 935 F.2d at 186–87.

Although, given the protective language employed by the Supreme Court when assessing tribal treaty rights, the question is a close one, ultimately we conclude that a general right of exclusion, with no additional specificity, is insufficient to bar application of federal regulatory statutes of general applicability. Unless there is a direct conflict between a specific right of exclusion and the entry necessary for effectuating the statutory scheme, we decline to prohibit application of generally applicable federal regulatory authority to tribes on the existence of such a treaty right alone. *See, e.g.*, *Id.*; *Smart*, 868 F.2d at 935. The 1864 Treaty states that the Isabella reservation land would be "set apart for the exclusive use, ownership, and occupancy [by the Tribe]." 14 Stat. 657. Similar to the treaty language in *US DOL*, the 1864 Treaty language

establishes a general right of exclusion for the Tribe. The treaty language does not, however, give the Tribe the specific power to condition authorization and entry of government agents, as in *Navajo Forest Products*. Nor does it detail with any level of specificity the types of activities the Tribe may control or in which it may engage. Thus, as did the Seventh Circuit in *Smart*, we find *Navajo Forest Products* distinguishable. Although, as explained below, the existence of the Treaties remains relevant to our analysis of the Tribe's right of inherent sovereignty, we do not find that the general right to exclude described in the 1855 and 1864 Treaties, standing alone, bars application of the NLRA to the Casino.

IV

We next turn to whether the Tribe's inherent sovereignty rights preclude application of the NLRA to the on-reservation Casino. The Board again latches on to the general statement in *Tuscarora Indian Nation* that "a general statute in terms applying to all persons includes Indians and their property interests." 362 U.S. at 116. The Board insists that we rely on this Supreme Court pronouncement to authorize the Board to exercise authority over the Casino. Alternatively, the Board urges us to adopt the analytical framework set forth by the Ninth Circuit in *Coeur d'Alene*, which it contends also would lead to the conclusion that the NLRA may be applied to the Casino.

After oral argument in the present appeal, a panel of this Court released a published decision in *NLRB v. Little River Band of Ottawa Indians Tribal Government*, No. 14-2239, 2015 WL 3556005 (6th Cir. June 9, 2015). In *Little River*, the majority held that the NLRB could apply the NLRA "to the operation of a casino resort of the Little River Band of Ottawa Indians" within a reservation on trust land. *Id.* at *1, *5–8. The majority reviewed "the law governing implicit divestiture of tribal sovereignty," *id.* at *5, and concluded that, based on "the *Montana* framework," its analysis was "guided by an overarching principle: inherent tribal sovereignty has a core and a periphery. At the periphery, the power to regulate the activities of non-members is constrained, extending only so far as 'necessary to protect tribal self-government or to control internal relations.'" *Id.* at *8 (quoting *Montana*, 450 U.S. at 564). The majority adopted the language of *Tuscarora* and the analytical framework of *Coeur d'Alene*, *id.* at *8–10, and found that "the *Coeur d'Alene* framework accommodates principles of federal and tribal sovereignty,"

*id.* at *12. Under the *Coeur d'Alene* structure, the majority deduced that the NLRA is a statute of general applicability, that the NLRA does not does not fall within any of the three enumerated exceptions of *Coeur d'Alene*, and that the NLRA applies to the Little River casino resort. *Id.* at *13–17 ("In sum, we find that this case does not fall within the exceptions to the presumptive applicability of a general statute outlined in *Coeur d'Alene*. The NLRA does not undermine the Band's right of self-governance in purely intramural matters, and we find no indication that Congress intended the NLRA not to apply to a tribal government's operation of tribal gaming . . . ."). Judge McKeague dissented, arguing that the "majority's decision impinges on tribal sovereignty, encroaches on Congress's plenary and exclusive authority over Indian affairs, conflicts with Supreme Court precedent, and unwisely creates a circuit split." *Id.* at *17 (McKeague, J., dissenting). In particular, Judge McKeague explained that the Board's use of the *Tuscarora-Coeur d'Alene* approach is fraught with problems and inconsistencies—"a house of cards . . . . [that] collapse[s] when we notice what's inexplicably overlooked in the fifty-five years of adding card upon card to a 'thing said in passing.'" *Id.* at *18–21, *26.

We are bound by the published decisions of prior panels of this Court. *Dingle v. Bioport Corp.*, 388 F.3d 209, 215 (6th Cir. 2004); *see also Wynne v. Renico*, 606 F.3d 867, 875 (6th Cir. 2010) (Martin, Jr., J., concurring) ("However, as this panel is bound by the decisions of a prior panel, no matter how illogical, I must concur." (footnote omitted)). The *Little River* majority concluded that the NLRA applies to on-reservation casinos operated on trust land. *Little River*, 2015 WL 3556005, at *13–17. Given the legal framework adopted in *Little River* and the breadth of the majority's holding, we must conclude in this case that the Casino operated by the Tribe on trust land falls within the scope of the NLRA, and that the NLRB has jurisdiction over the Casino.[9] We do not agree, however, with the *Little River* majority's adoption of the *Coeur d'Alene* framework, or its analysis of Indian inherent sovereignty rights. We thus set out below the approach that we believe is most consistent with Supreme Court precedent and Congress's supervisory role over the scope of Indian sovereignty, and why we respectfully disagree with the holding in *Little River*.

---

[9]There was "no treaty right at issue" in *Little River*. 2015 WL 3556005, at *13. As discussed in section III, *supra*, we do not believe that the 1855 and 1864 Treaties are sufficient, standing alone, to prevent application of the NLRA to the Casino. Although the fact of the Treaties remains relevant to the sovereignty analysis and, thus, factually distinguishes this case from *Little River*, that fact cannot compel a contrary conclusion here given the legal framework we are compelled by *Little River* to employ.

A

We begin with what we believe is the analytical framework dictated by the Supreme Court for cases like that before us. Indian tribes have "always been considered as distinct, independent political communities, retaining their original natural rights," and, even with their association under the federal government, did not "surrender [their] independence—[their] right to self government[—]by associating with a stronger [sovereign], and taking its protection." *Worcester*, 31 U.S. (6 Pet.) at 559, 561. The tribes remain "a separate people, with the power of regulating their internal and social relations." *United States v. Kagama*, 118 U.S. 375, 381–82 (1886). The Supreme Court has recognized that "Indian tribes do retain elements of 'quasi-sovereign' authority after ceding their lands to the United States and announcing their dependence on the Federal Government." *Oliphant v. Suquamish Indian Tribe*, 435 U.S. 191, 208 (1978), *superseded by statute as recognized in United States v. Lara*, 541 U.S. 193, 199–207 (2004). These retained powers inherent to tribal sovereignty are not limited to just those powers explicitly recognized in treaties—the tribes are only "prohibited from exercising both those powers of autonomous states that are expressly terminated by Congress *and* those powers *inconsistent with their status*." *Id.* at 208 (internal quotation marks omitted; emphasis in original).

By agreeing to "come under the territorial sovereignty of the United States," Indian tribes are constrained in "their exercise of separate power . . . so as to not conflict with the interests of this overriding sovereignty." *Id.* at 209; *see also Kagama*, 118 U.S. at 381 (stating that tribes are no longer "possessed of the full attributes of sovereignty"); *Johnson v. M'Intosh*, 21 U.S. (8 Wheat.) 543, 574 (1823). And they have been "necessarily divested [] of some aspects of the sovereignty which they had previously exercised." *United States v. Wheeler*, 435 U.S. 313, 323 (1978), *superseded by statute as recognized in Lara*, 541 U.S. at 199–207. "The special brand of sovereignty the tribes retain—both its nature and its extent—rests in the hands of Congress." *Michigan v. Bay Mills Indian Cmty.*, 134 S. Ct. 2024, 2037 (2014). The tribes do retain important inherent rights of sovereignty, however, even after coming under the protective sphere of the federal government. *See Plains Commerce Bank v. Long Family Land & Cattle Co.*, 554 U.S. 316, 327 (2008) (noting that the retained sovereignty of the Indian tribes "centers on

the land held by the tribe and on tribal members within the reservation"). Among these inherent rights, "unless limited by treaty or statute," is the "power to determine tribe membership; to regulate domestic relations among tribe members; and to prescribe rules for the inheritance of property." *Wheeler*, 435 U.S. at 322 n.18 (internal citations omitted). In summarizing these principles, the Supreme Court has explained that:

> The sovereignty that the Indian tribes retain is of a unique and limited character. It exists only at the sufferance of Congress and is subject to complete defeasance. But until Congress acts, the tribes retain their existing sovereign powers. In sum, Indian tribes still possess those aspects of sovereignty not withdrawn by treaty or statute, or by implication as a necessary result of their dependent status.

*Id.* at 323.

In other cases, the Supreme Court has identified areas of inherent tribal sovereignty that go beyond those specified in *Wheeler*. In *Merrion*, the Court concluded that the power to institute a severance tax on oil and gas removed from reservation land was a "fundamental attribute of sovereignty," and explained that "[t]he power to tax is an essential attribute of Indian sovereignty because it is a necessary instrument of self-government and territorial management." 455 U.S. at 137 ("This power enables a tribal government to raise revenues for its essential services."). The Court explained that "[t]o presume that a sovereign forever waives the right to exercise one of its sovereign powers unless it expressly reserves the right to exercise that power in a commercial agreement turns the concept of sovereignty on its head . . . ." *Id.* at 148; *see also Atkinson Trading Co. v. Shirley*, 532 U.S. 645, 652 (2001) (explaining that a tribe's power to tax comes from not only the tribe's power to exclude nonmembers from tribal land, but also from the tribe's "general authority, as sovereign, to control economic activity within its jurisdiction" (quoting *Merrion*, 455 U.S. at 137)). In *Iowa Mutual Insurance Co. v. LaPlante*, the Court reiterated the federal government's "longstanding policy of encouraging tribal self-government," and noted that "[t]ribal authority over the activities of non-Indians on reservation lands is an important part of tribal sovereignty." 480 U.S. 9, 14, 18 (1987).

The Court's seminal statement on the extent to which a tribe's sovereignty extends to the conduct of nonmembers on reservation land comes from *Montana*, which the Court itself subsequently described as the "pathmarking case on the subject." *Nevada v. Hicks*, 533 U.S.

353, 358 (2001) (internal quotation marks omitted); *see also Atkinson Trading*, 532 U.S. at 650 (describing *Montana* as "the most exhaustively reasoned of [the] modern cases addressing" an Indian tribe's "retained or inherent sovereignty"). The *Montana* Court analyzed the "sources and scope of the power of an Indian tribe to regulate hunting and fishing by non-Indians on lands within its reservation owned in fee simple by non-Indians." 450 U.S. at 547; *see also Atkinson Trading*, 532 U.S. at 647 ("In *Montana . . .* we held that, with limited exceptions, Indian tribes lack civil authority over the conduct of nonmembers on non-Indian fee land within a reservation."); *Montana*, 450 U.S. at 557 (describing the "regulatory issue before us" as "a narrow one"). There, the Court set forth the standards with which to analyze the scope of a tribe's authority to regulate the conduct of nonmembers even in the absence of a treaty granting the tribe reserved rights. 450 U.S. at 566–67; *see also Plains Commerce Bank*, 554 U.S. at 332 ("*Montana* and its progeny permit tribal regulation of nonmember *conduct* inside the reservation that implicates the tribe's sovereign interests." (emphasis in original)). The Court recognized that "exercise of tribal power beyond what is necessary to protect tribal self-government or to control internal relations is inconsistent with the dependent status of the tribes, and so cannot survive without express congressional delegation. *Montana*, 450 U.S. at 564 (citing *Wheeler*, 435 U.S. at 323–26). The Court thus acknowledged the "general proposition that the inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe," when such activity occurs on land not owned by a member or held in trust for the tribe. *Id.* at 565. Importantly, the Court identified two exceptions to this general rule, even with respect to activities within the reservation that occur on fee land owned by nonmembers:

> To be sure, Indian tribes retain inherent sovereign power to exercise some forms of civil jurisdiction over non-Indians on their reservations, even on non-Indian fee lands. A tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements. A tribe may also retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe.

*Id.* at 565–66 (internal citations omitted); *see also Plains Commerce Bank*, 554 U.S. at 335 ("[C]ertain forms of nonmember behavior, even on non-Indian fee land, may sufficiently affect

the tribe as to justify tribal oversight."). As neither exception applied to nonmember hunting and fishing on nonmember fee land, the Court found that the state was permitted to regulate hunting and fishing on such land. In reaching this conclusion, the Court stressed, however, that the tribe's authority as to nonmember hunting or fishing activities was *not* limited on tribal lands. *See Montana*, 450 U.S. at 557 ("The Court of Appeals held that the Tribe may prohibit nonmembers from hunting or fishing on land belonging to the Tribe or held by the United States in trust for the Tribe, and with this holding we can readily agree." (internal citation omitted)).

Although it seemed that *Montana* created a bright line distinction between the regulation of nonmember activity when on non-Indian fee land and when on other land within the reservation—implying that tribes retain full sovereign rights to regulate all conduct on the latter[10]—the Supreme Court has since explained that land ownership is but one factor in assessing the scope of a tribe's inherent sovereignty. In *Hicks*, the Court considered whether tribal courts had jurisdiction over claims asserted under 42 U.S.C. § 1983 against nonmember state wardens executing search warrants on trust land within the reservation relating to off-reservation conduct. 533 U.S. at 357. The Court found that the ownership status of the property where the relevant activity occurred—i.e., whether it is owned by a nonmember in fee or in trust for the tribe—is "only one factor to consider in determining whether regulation of the activities of nonmembers is necessary to protect tribal self-government or to control internal relations," albeit an important one. *Id.* at 359–60 (internal quotation marks omitted); *id.* at 370 ("[T]ribal ownership [of land] is a factor in the *Montana* analysis, and a factor significant enough that it 'may sometimes . . . be [] dispositive'" (quoting *Hicks,* 533 U.S. at 360)); *see also Plains Commerce Bank*, 554 U.S. at 331 ("The status of the land is relevant insofar as it bears on the application of . . . *Montana*'s exceptions to [this] case." (internal citations and quotation marks omitted) (alterations in original)); *Hicks*, 533 U.S. at 370. Thus, the Court made clear that, although a significant factor, "the existence of tribal ownership is not alone enough to support regulatory jurisdiction over nonmembers." *Hicks*, 533 U.S. at 360.

---

[10]Indeed the United States Solicitor General has recently read *Montana* as creating such a distinction, and allowing tribes virtually unrestricted authority over nonmembers on trust or Indian-owned fee land. Brief for United States as Amicus Curiae on Petition for Writ of Certiorari at 9–12, *Dollar Gen. Corp. v. Miss. Band of Choctaw Indians* (U.S. 2015) (No. 13-1496), *cert. granted*, No. 13–1496, 2015 WL 2473345 (U.S. June 15, 2015).

Beyond its discussion of the importance of the land's ownership status to the *Montana* analysis, the *Hicks* Court further explained that the first *Montana* exception refers "to private individuals who voluntarily submitted themselves to tribal regulatory jurisdiction by the arrangements that they (or their employers) entered into." *Id.* at 372; *see also Plains Commerce Bank*, 554 U.S. at 332 ("We cited four cases in explanation of *Montana*'s first exception. Each involved regulation of non-Indian activities on the reservation that had a discernible effect on the tribe or its members."). Thus, the Court explained that the *Montana* framework is the governing analysis for determining a tribe's inherent sovereign regulatory powers over nonmembers; that we must consider *both* land status and party status in our analysis of: (1) the scope of the inherent sovereign rights retained by the tribe, and (2) the application of the *Montana* exceptions; and that the ownership status of the land is to receive significant weight with respect to both inquiries. Applying this analysis, the Court concluded that the tribal courts did not have authority to adjudicate the § 1983 claims, finding that, although the searches were conducted on trust land, the law enforcement officers were nonmembers attempting to address conduct that occurred outside the reservation. *Hicks*, 533 U.S. at 374. And the Court's most recent pronouncement on Indian law, in *Bay Mills*, clarifies that "[a]lthough Congress has plenary authority over tribes, courts will not lightly assume that Congress in fact intends to undermine Indian self-government." 134 S. Ct. at 2032.

We believe this Supreme Court precedent clarifies that, absent a clear statement by Congress, to determine whether a tribe has the inherent sovereign authority necessary to prevent application of a federal statute to tribal activity, we apply the analysis set forth in *Montana*. *Iowa Mut.*, 480 U.S. at 18 ("Civil jurisdiction over such activities presumptively lies in the tribal courts unless affirmatively limited by a specific treaty provision or federal statute."); *Merrion*, 455 U.S. at 148 n.14 (recognizing that the "Tribe retains all inherent attributes of sovereignty that have not been divested by the Federal Government . . . ."); *Santa Clara Pueblo*, 436 U.S. at 60 ("[A] proper respect both for tribal sovereignty itself and for the plenary authority of Congress in this area cautions that we tread lightly in the absence of clear indications of legislative intent."); *Wheeler*, 435 U.S. at 323 ("Indian tribes still possess those aspects of

sovereignty not withdrawn by treaty or statute, or by implication as a necessary result of their dependent status.").[11]

Under *Montana*, we believe our analysis should proceed as follows. We would first determine whether Congress has demonstrated a clear intent that a statute of general applicability will apply to the activities of Indian tribes. If so, we would effectuate Congress's intent, as Congress has the authority, as the superior sovereign, "to legislate for the Indian tribes in all matters." *Wheeler*, 435 U.S. at 319. If Congress has not so spoken, we would then determine if the generally applicable federal regulatory statute impinges on the Tribe's control over its own members and its own activities. *Id.* at 322 n.18; *see also Montana*, 450 U.S. at 564. If it has, the general regulatory statute will not apply against the Tribe as a sovereign. If we find that the generally applicable federal statute does not impinge on the Tribe's right to govern activities of its members—such as those sovereign rights discussed in *Wheeler* and *Merrion*—we would assume that, generally, "the inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe." *Montana*, 450 U.S. at 565. And we would determine, then, whether the Tribe has demonstrated that one of the two *Montana* exceptions to the general rule—consensual commercial relationships between the Tribe and nonmembers, or conduct "that . . . threatens or has some direct effect on" aspects of tribal sovereignty—applies. *Id.* at 565–66; *see also Plains Commerce Bank*, 554 U.S. at 330 ("The burden rests on the tribe to establish one of the exceptions to *Montana's* general rule"). When analyzing the exceptions, we would apply a totality of the circumstances analysis, considering factors such as the member/nonmember distinction, and the location of the conduct at issue (whether on trust or member fee land, or on nonmember fee land). *Hicks*, 533 U.S. at 357–60. If one of the exceptions applies, the generally applicable federal statute should not apply to tribal conduct, and Congress must amend the statute for it to apply against the Tribe if Congress so desires. If one of the exceptions does not apply, the Tribe would be subject to the provisions of the federal statute.

---

[11]The Supreme Court has noted that there is no "inflexible *per se* rule precluding state jurisdiction over tribes and tribal members in the absence of express congressional consent." *California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 214–15 & n.17 (1987); *see also New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 330–36 (1983). This case is distinguishable from the state preemption cases, however, as here we must determine the balance of power between a silent greater sovereign and the lesser sovereign, not the balance of power between two sovereigns of similar status attempting to assert jurisdiction over the same conduct.

We agree with the Board that the NLRA is a statute of general applicability, as the language of the statute indicates that the Act applies generally absent a few specific statutory exceptions. *See, e.g.*, 29 U.S.C. § 152. And, as the AJ correctly noted, neither the NLRA nor its legislative history contains any evidence that Congress intended to either cover or exclude Indians and tribes from the purview of the Act. *Soaring Eagle*, 2013 WL 1656049, at *13. In the present case, Lewis is a nonmember of the Tribe who was suspended and dismissed from her position, so the aspects of inherent sovereignty recognized in *Wheeler* and *Merrion* are not applicable. Accordingly, unless one of the *Montana* exceptions covers the application of the NLRA to a tribal-owned casino on trust property, the NLRA should apply to the Casino and would bar the no-solicitation policy.

We conclude that, under an appropriate analytical framework, the first *Montana* exception concerning consensual commercial relationships between the Tribe and nonmembers should apply to these facts. *See, e.g., Dolgencorp, Inc. v. Miss. Band of Choctaw Indians*, 746 F.3d 167 (5th Cir. 2014) (applying the *Montana* framework to conclude that tribal courts have jurisdiction over claims made by a member against a nonmember due to an alleged tort committed at a nonmember-owned Dollar General store situated on trust property), *cert. granted sub nom. Dollar Gen. Corp. v. Miss. Band of Choctaw Indians*, No. 13–1496, 2015 WL 2473345 (U.S. June 15, 2015). The first *Montana* exception recognizes that, as a sovereign, the Tribe has the power to enter into contractual relationships with nonmember individuals and entities for work on reservation property, whether Indian owned or not, and to place conditions on those contracts. *Montana*, 450 U.S. at 565–66. The Tribe therefore has the power to negotiate for certain conditions in these contracts, with those conditions often representing important policy goals for the Tribe, such as a tribal member employment preference policy. And, the Tribe often must seek the provision of services by nonmembers because the Tribe may have insufficient members to provide all necessary services, or may recognize that it is more efficient to have contractors provide these services. As the Court recognized in *Hicks*, the exception applies "to private individuals who voluntarily submitted themselves to tribal regulatory jurisdiction by the arrangements that they (or their employers) entered into." 533 U.S. at 372. Unlike tribal assertion of criminal jurisdiction over nonmembers, the first *Montana* exception for civil jurisdiction recognizes that, when a nonmember voluntarily enters into a commercial relationship

with the Tribe, the Tribe as a sovereign itself may choose to place conditions on its contractual relationships with those nonmembers, and the courts will not annul the private dealings of the Tribe with nonmembers absent clear statements of Congress's desire to abrogate those dealings.

Under the totality of the circumstances, we would find that the Casino's no-solicitation policy and its suspension and termination of Lewis fall under the first *Montana* exception. The Casino itself is not a purely private venture, but it is an important vehicle for the exercise of tribal sovereignty. The Casino was established as a subdivision of the tribal government, and is managed by the tribal council. *Soaring Eagle*, 2013 WL 1656049, at *5. The Casino requires over 3,000 employees, evidencing a need for nonmember hiring. *Id.* at *6. But it is mainly managed by members, who then report to the tribal council. *Id.* The Casino's revenue constitutes 90% of the Tribe's income, providing for the vast majority of the services provided by the government to tribal members. *Id.* Considering the lack of exploitable natural resources on the Isabella Reservation, the Casino permits the Tribe to provide necessary services for its members without relying on substantial federal assistance. And, as the Supreme Court has recognized in the context of severance taxes, the power and ability of a tribal government "to raise revenues for its essential services" is an important aspect of tribal sovereignty. *Merrion*, 455 U.S. at 137.

As for the location of the tribal enterprise, the Court expressly noted in *Montana* that the tribe has greater powers to exclude and regulate nonmember hunting and fishing on land held by the United States in trust for the tribe, 450 U.S. at 557, and in *Hicks* the Court described the ownership status of the land to be such a significant factor that it may be dispositive, 533 U.S. at 370. Here, the Casino is situated not just on Isabella Reservation property, but on trust property. Although the 1855 and 1864 Treaties are not alone sufficient to block application of the NLRA, the Treaties are relevant to the Tribe's interest in conditioning entry and employment on its own lands. The Tribe considered recognition of its continuing control over entry to its property so important that it was one of the few rights and privileges retained by the Tribe and mentioned explicitly in the Treaty. And, although Lewis's status as a nonmember is relevant to whether her activities encroach upon the sovereignty of the Tribe, that status is precisely what gives rise to an analysis of the *Montana* exceptions—we do not even reach the exceptions unless the tribal policy

affects nonmembers. The fact that Lewis was a nonmember only initiates the *Montana* analysis, it does not resolve it.[12]

We believe that the weight of these factors supports our conclusion that the NLRA should not apply to the Casino. We consider relevant: (1) the fact that the Casino is on trust land and is considered a unit of the Tribe's government; (2) the importance of the Casino to tribal governance and its ability to provide member services; and (3) that Lewis (and other nonmembers) voluntarily entered into an employment relationship with the Tribe. We recognize that our determination would have inhibited the Board's desire to apply the NLRA to all employers not expressly excluded from its reach. But Congress retains the ability to amend the NLRA to apply explicitly to the Casino, if it so chooses.[13] *See Bay Mills*, 134 S. Ct. at 2037 ("[I]t is fundamentally Congress's job, not ours, to determine whether or how to limit tribal immunity.") We note, however, that to the extent Congress already has acted with respect to Indian sovereignty and Indian gaming, it has shown a preference for protecting such sovereignty and placing authority over Indian gaming squarely in the hands of tribes. In the same year Congress enacted the NLRA, it also passed the Indian Reorganization Act of 1934 ("IRA"), 25 U.S.C. § 461 *et seq.*, to strongly promote Indian sovereignty and economic self-sufficiency, and to move federal policy away from a goal of assimilation. *See New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 335 & n.17 (1983) (identifying the IRA, as well as similar statutes like the Indian Financing Act of 1974, 25 U.S.C. § 1451 *et seq.*, and the Indian Civil Rights Act of 1968, 25 U.S.C. § 1301 *et seq.*, as supporting tribal self-government by promoting "tribal self-sufficiency and economic development."); *see also* Brief for the National Congress of American Indians as Amicus Curiae in Support of Petitioner at 11–19, *Saginaw Chippewa Indian Tribe of*

---

[12]In *Atkinson Trading*, the Court held that the first *Montana* exception included a nexus requirement— "*Montana's* consensual relationship exception requires that the tax or regulation imposed by the Indian tribe have a nexus to the consensual relationship itself." 532 U.S. at 656. It is clear that the nexus requirement of *Atkinson Trading* is met here—the no-solicitation policy is directly related to the employment relationship that Lewis voluntarily entered with the Casino, and her employment was subject to the terms of that policy. 532 U.S. at 656. This is not a case where "[a] nonmember's consensual relationship in one area [ ] does not trigger tribal civil authority in another . . . ." *Id.* Lewis entered a contractual relationship with the Casino (and therefore the Tribe), and her violations of the policy-at-issue directly initiated the present complaint before the Board.

[13]The Executive Branch does not appear to agree with the Board's application of the NLRA to tribal activities. In a December 7, 2011 letter to the Board, the Department of the Interior expressed its view that tribal governments, like state and local governments, should be excepted from the NLRA's reach under the employer exception in 29 U.S.C. § 152(2). Letter from Patrice H. Kunesh, Deputy Solicitor–Indian Affairs, U.S. Dep't of the Interior, to Lafe Soloman, Acting General Counsel, Nat'l Labor Relations Bd. (Dec. 7, 2011) (Appellant App. 155–56).

*Michigan v. NLRB* (6th Cir. 2015) (Nos. 14-2405, -2558). Thus, although Congress was silent regarding tribes in the NLRA, it was anything but silent regarding its contemporaneously-stated desire to expand tribal self-governance. And, more recently, Congress enacted the IGRA "to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments," and "to ensure that the Indian tribe is the primary beneficiary of the gaming operation." 25 U.S.C. § 2702; *see also id.* § 2710(b)(2)(B)(i) (requiring that "net revenues from any tribal gaming" are only be used, *inter alia*, "to fund tribal government operations or programs," "to provide for the general welfare of the Indian tribe and its members," and "to promote tribal economic development"); *id.* §§ 2710(b)(2)(F),(d)(1)(A)(ii) (describing required contents of tribal ordinances or tribal-state compacts regarding employment practices of gaming employers); *Bay Mills*, 134 S. Ct. at 2043 (Sotomayor, J., concurring) ("And tribal business operations are critical to the goals of tribal self-sufficiency because such enterprises in some cases may be the only means by which a tribe can raise revenues." (internal quotation marks omitted)).

For all of these reasons, if writing on a clean slate, we would conclude that, keeping in mind "a proper respect both for tribal sovereignty itself and for the plenary authority of Congress in this area," *Santa Clara Pueblo*, 436 U.S. at 60, the Tribe has an inherent sovereign right to control the terms of employment with nonmember employees at the Casino, a purely tribal enterprise located on trust land.**[14]** The NLRA, a statute of general applicability containing no expression of congressional intent regarding tribes, should not apply to the Casino and should not render its no-solicitation policy void.

B

As noted, we believe our analysis is in accordance with the Supreme Court precedents on which we rely. We now address the *Little River* majority's decision to adopt a different analytical structure—the one the Board outlined in *San Manuel Indian Bingo & Casino*. In *San Manuel*, the Board reconsidered "whether [it] should assert jurisdiction over a commercial enterprise that is wholly owned and operated by an Indian tribe on the tribe's reservation," in

---

**[14]**Given our analysis of the first *Montana* exception, we do not reach the second one, despite the Tribe's reliance on it.

particular, a casino. 341 NLRB at 1055. Prior to *San Manuel*, the Board had established a geographical approach to its jurisdiction over Indian tribes—generally, if the tribal enterprise was located off-reservation, the Board would assert jurisdiction, *see, e.g., Sac & Fox Indus., Ltd.*, 307 NLRB 241 (1992), but the Board would not attempt to assert jurisdiction for on-reservation tribal enterprises, even those on non-Indian fee land, *see, e.g., Fort Apache Timber Co.*, 226 NLRB 503 (1976). *San Manuel*, 341 NLRB at 1056–57. The Board in *San Manuel* rejected its prior geographical approach, concluding that "[t]he location of a tribal enterprise on an Indian Reservation does not alter our conclusion that [29 U.S.C. § 152(2)] does not compel an exception for Indian tribes." *Id.* at 1058–59. Instead, over a dissent by Member Schaumber, the Board adopted the Ninth Circuit's framework in *Coeur d'Alene* for determining when a statute of general applicability applies to tribal enterprises. *Id.* at 1059–61. The Board also added a discretionary component to the *Coeur d'Alene* analysis for evaluating whether "policy considerations militate in favor of or against the assertion of the Board's discretionary jurisdiction." *Id.* at 1062; *see also id.* ("Our purpose in undertaking this additional analytical step is to balance the Board's interest in effectuating the policies of the Act with its desire to accommodate the unique status of Indians in our society and legal culture."). As in the present appeal, the Board in *San Manuel* found that application of the *Coeur d'Alene* framework justified its assertion of jurisdiction over the Casino. *Id.* at 1063–64.

The *Coeur d'Alene* framework represents the Ninth Circuit's attempt to balance the scope of generally applicable federal regulatory statutes with the traditional federal concerns of deference to tribal sovereignty. In *Coeur d'Alene*, the Ninth Circuit considered whether OSHA applied to a farm owned and operated by the Coeur d'Alene Tribe in northern Idaho. *Coeur d'Alene*, 751 F.2d at 1114–15. The Ninth Circuit began with what it characterized as the general presumption of *Tuscarora* that "a general statute in terms applying to all persons includes Indians and their property interests." *Id.* at 1115 (quoting *Tuscarora*, 362 U.S. at 116). Though the court recognized that this language from *Tuscarora* may have been dictum, it still adopted the language as its guiding principle. *Id.* The court then identified three exceptions to the *Tuscarora* principle:

> A federal statute of general applicability that is silent on the issue of applicability
> to Indian tribes will not apply to them if: (1) the law touches "exclusive rights of

self-governance in purely intramural matters"; (2) the application of the law to the tribe would "abrogate rights guaranteed by Indian treaties"; or (3) there is proof "by legislative history or some other means that Congress intended [the law] not to apply to Indians on their reservations . . . ."

*Id.* at 1116 (quoting *Farris*, 624 F.2d at 893–94). The Ninth Circuit concluded that OSHA was a statute of general applicability, the "tribal self-governance" exception did not include "all tribal business and commercial activity," and there was no treaty or legislative history demonstrating a congressional intent that the statute would not apply to Indian activities. *Id.* at 1116–18. It found, therefore, that OSHA applied to the tribe's commercial farming operations. *Id.* at 1118. In *U.S. Department of Labor v. Occupational Safety & Health Review Commission*, 935 F.2d 182, 184–87 (9th Cir. 1991), again applying the *Coeur d'Alene* framework, the Ninth Circuit determined that OSHA permitted inspectors to enter tribal property even in light of language in a treaty granting a general right of exclusion to the tribe. And, the Ninth Circuit has held that the NLRA applies to a tribal health services organization, finding the NLRA not materially distinguishable from other federal regulatory statutes of general applicability that the court previously applied to tribal enterprises. *NLRB v. Chapa De Indian Health Program, Inc.*, 316 F.3d 995, 998–99 (9th Cir. 2003). Notably, however, the Ninth Circuit did not discuss *Montana* or its exceptions in *Coeur d'Alene*, and did not acknowledge *Hicks* in its *Chapa de Indian Health Program* decision.

As did the *Little River* majority, other circuits also have adopted the *Coeur d'Alene* framework. The Second Circuit adopted the *Coeur d'Alene* framework when also holding that OSHA reached tribal enterprises. *Reich v. Mashantucket Sand & Gravel*, 95 F.3d 174, 177–79 (2d Cir. 1996) (concluding that OSHA applied to a construction business owned by an Indian tribe). And the Eleventh Circuit in *Florida Paraplegic Ass'n v. Miccosukee Tribe of Indians of Florida*, 166 F.3d 1126, 1128–30 (11th Cir. 1999), used the *Coeur d'Alene* framework to conclude that Title III of the Americans with Disabilities Act applied to a tribal restaurant and gaming facility. Similarly, the Seventh Circuit in *Smart*, under the *Coeur d'Alene* framework, held that the Employee Retirement Income Security Act ("ERISA") applied to tribal employers. 868 F.2d at 932–36; *see also Menominee Tribal Enters.*, 601 F.3d at 671–74 (describing a framework similar to *Coeur d'Alene* and concluding that OSHA applied to a tribal sawmill).

The Tenth Circuit, on the other hand, has rejected the *Coeur d'Alene* framework.  In *NLRB v. Pueblo San Juan*, 280 F.3d 1278 (10th Cir. 2000), the Tenth Circuit concluded that the NLRA did not prevent a tribal council from enacting a right-to-work ordinance.  A panel of the Tenth Circuit held that §§ 8(a)(3), 14(b) of the NLRA did not prohibit a tribal right-to-work ordinance because, *inter alia*: (1) the *Tuscarora* presumption does not apply because the NLRA is not a statute of general applicability as it excludes states and territories, and (2) the first *Montana* exception protects a tribe's "inherent sovereign power to exercise some forms of civil jurisdiction over non-Indians engaged in commercial activities on Indian land."  *Id.* at 1283–84; *see also id.* at 1285 ("As in [*Navajo Forest Products*], we have been reluctant to apply statutes which regulate the terms and conditions of employment . . . unless the statute expressly includes Indian tribes . . . .").  On rehearing en banc, the full court affirmed the panel's holding that the NLRA did not bar the tribal council's right-to-work ordinance.  *NLRB v. Pueblo of San Juan*, 276 F.3d 1186 (10th Cir. 2002) (en banc).  The en banc court made clear, however, that "the general applicability of federal labor law is not at issue," but merely whether Congress "divested" the tribe of its inherent sovereign authority to adopt a right-to-work ordinance by enacting §§ 8(a)(3), 14(b) of the NLRA.  *Id.* at 1191.  The court found no express or implied divestiture of the tribe's authority to enact the right-to-work ordinance in the NLRA, especially considering the strong presumptions in favor of respecting broad tribal sovereignty in the face of congressional silence.  *Id.* at 1194–96 ("The correct presumption is that silence does not work a divestiture of tribal power.").  The court also distinguished *Tuscarora* as dealing "solely with issues of ownership, not with questions pertaining to the tribe's sovereign authority to govern the land," and rejected application of the *Tuscarora/Coeur d'Alene* framework when the tribe acts as a sovereign rather than as a property owner.  *Id.* at 1198–1200; *see also Merrion*, 455 U.S. at 145–46 n.12 (quoting a treatise on Indian law written by the Department of the Interior that distinguished the rights of tribes as landowners from their rights as sovereigns on reservation property).  The Tenth Circuit has since reiterated this approach to federal regulatory statutes of general applicability in *Dobbs v. Anthem Blue Cross & Blue Shield*, 600 F.3d 1275, 1283–85 (10th Cir. 2010), where the court considered whether changes to ERISA's preemption for "governmental plan[s]" to include plans established by tribal governments applied retroactively.  The Tenth Circuit again noted that "respect for Indian sovereignty means that federal regulatory

schemes do not apply to tribal governments exercising their sovereign authority absent express congressional authorization." *Id.* at 1283.

The Eighth Circuit also seems to reject the *Coeur d'Alene* framework. In *EEOC v. Fond du Lac Heavy Equipment & Construction Co.*, 986 F.2d 246, 248–50 (8th Cir. 1993), the Eighth Circuit analyzed whether the Age Discrimination in Employment Act ("ADEA") applied to a suit brought by a tribal member against a tribal employer. The Eighth Circuit acknowledged the broad language in *Tuscarora*, but concluded that an internal ADEA dispute with a tribal member affected "the tribe's specific right of self-government" such that the "general rule of applicability does not apply." *Id.* at 249; *see also id.* at 248 ("Specific Indian rights will not be deemed to have been abrogated or limited absent a 'clear and plain' congressional intent." (internal citation omitted)).

The D.C. Circuit, on review of the Board's *San Manuel* analysis, seemed to chart a different course. The D.C. Circuit noted that the question posed was difficult because Congress "in all likelihood never contemplated the [NLRA's] potential application to tribal employers," and the fact that there are "conflicting Supreme Court canons of interpretation [those regarding statutes of general applicability in *Tuscarora* and those in other cases regarding the need to protect Indian sovereignty] that are articulated at a fairly high level of generality." *San Manuel*, 475 F.3d at 1310. The D.C. Circuit explained that the "gravitational center [of its analysis] . . . is tribal sovereignty," and found the *Tuscarora* presumption to be both potentially dictum and inconsistent with the Indian canons of construction. *Id.* at 1311–12. Rather than adopt the *Coeur d'Alene* framework, the D.C. Circuit instead stated its role was to balance the scope of inherent tribal sovereignty with government interests in uniform application of regulatory statutes. *Id.* at 1312–13 ("[A] statute of general application can constrain the actions of a tribal government without at the same time impairing tribal sovereignty."); *see also id.* at 1315 (noting that the *Coeur d'Alene* framework was "different from the one we employ here"). The D.C. Circuit recognized that tribal sovereignty is at its strongest when explicitly protected by a treaty or involving intramural tribal matters, and is at its weakest for off-reservation activities. *Id.* For situations between those extremes, the court looked to a "particularized inquiry" that determined "the extent to which application of the general law will constrain the tribe with respect to its

governmental functions," through consideration of a variety of factors, including the location of the activity in question and the sovereign right at issue. *Id.* at 1313–15 ("In sum, the Supreme Court's decisions reflect an earnest concern for maintaining tribal sovereignty, but they also recognize that tribal governments engage in a varied range of activities many of which are not activities we normally associate with governance."). The court concluded that application of the NLRA to a casino would not "impinge on the Tribe's sovereignty enough to indicate a need to construe the statute narrowly against application to employment at the Casino," because: (1) operating a casino is a traditionally commercial, not governmental, function; (2) enactment of labor legislation was "ancillary to that commercial activity"; and (3) the majority of the employees were nonmembers. *Id.* at 1314–15. In conducting this analysis, however, the court neither discussed the *Montana* exceptions, nor the Supreme Court's confirmation in *Hicks* that *Montana* was the "pathmarking" case we are to follow in this area. *Hicks*, 533 U.S. at 358.

In sum, the Second, Seventh, Ninth, Eleventh, and now the Sixth, Circuits, apply the *Coeur d'Alene* framework to determine whether statutes of general applicability apply to Indian tribes, the Eighth and Tenth Circuits reject it, and the D.C. Circuit applies a fact-intensive analysis of the tribal activity at issue and a policy inquiry comparing the federal interest in the regulatory scheme at issue with the federal interest in protecting tribal sovereignty.

We would reject the *Coeur d'Alene* framework for determining the reach of federal statutes of general applicability, instead choosing to structure our analysis on the guidance we glean from *Montana* and *Hicks*. Although we agree with the D.C. Circuit that a regulatory statute's impact on tribal sovereignty requires a fact-based inquiry, we believe the Supreme Court has told us how to balance the competing federal interests at issue—by reference to the *Montana* exceptions, as further explained in *Hicks*.

The *Coeur d'Alene* framework unduly shifts the analysis away from a broad respect for tribal sovereignty, and the need for a clear statement of congressional intent to abrogate that sovereignty, and does so based on a single sentence from *Tuscarora*. Both the *Coeur d'Alene* and *San Manuel* courts recognized that the sentence from *Tuscarora* upon which *Coeur d'Alene* relied may be dictum, and that the Supreme Court has never cited *Tuscarora* for that proposition, including in its more recent decisions discussing the scope of inherent tribal sovereignty in the

face of federal regulatory activity. We doubt *Tuscarora* can bear the weight placed on it by the *Coeur d'Alene* framework or the strain of the Court's more recent contrary pronouncements on Indian law. And, on the foundation of this potentially faulty premise, the *Coeur d'Alene* framework structures three fairly limited "exceptions" it finds adequate to respect tribal sovereignty. The second and third exceptions are fairly obvious and, thus, are less divisive. The Supreme Court case law discussed above explains that we should not read later congressional activity to abrogate a specifically articulated treaty right absent a clear statement by Congress. And, it would make little sense for a court to find that a statute of general applicability would apply in the face of statements by Congress in the legislative history that the statute should *not* apply to Indians. Our concern, instead, is with the first exception, involving "exclusive rights of self-governance in purely intramural matters." *Coeur d'Alene*, 751 F.2d at 1116. Those Circuits adopting the *Coeur d'Alene* framework have read this language restrictively, such that "rights of self-governance" only apply to the limited situations identified in *Wheeler*, 435 U.S. at 322 n.18. But, as discussed above, the Supreme Court has identified categories of sovereignty that go beyond those in *Wheeler*. *See, e.g.*, *Merrion*, 453 U.S. at 137 (the power to tax removal of natural resources from reservation land). And, in *Montana* and *Hicks*, the Supreme Court made clear that a tribe's right to self-governance and its power to regulate the conduct of nonmembers extends to consensual commercial relationships with nonmembers. Despite visiting the question of tribal authority over nonmembers on multiple occasions since *Coeur d'Alene* was decided in 1985, moreover, the Supreme Court has never cited nor endorsed its reasoning. Ultimately, we find that the *Coeur d'Alene* framework, and especially its description of its first exception, overly constrains tribal sovereignty, fails to respect the historic deference that the Supreme Court has given to considerations of tribal sovereignty in the absence of congressional intent to the contrary, and is inconsistent with the Supreme Court directives in *Montana* and *Hicks*.

Both the *Coeur d'Alene* framework and the D.C. Circuit's analysis in *San Manuel* also appear to create an analytical dichotomy between commercial and more traditional governmental functions of Indian tribes. *See Coeur d'Alene*, 751 F.2d at 1116–17 (differentiating between "tribal self-government" and "commercial activity"); *San Manuel*, 475 F.3d at 1314–15. The *Little River* majority characterizes this distinction as one between "core" tribal concerns and those lying on the "periphery" of tribal sovereignty. 2015 WL 3556005, at *8. We believe this

government-commercial or core-periphery distinction distorts the crucial overlap between tribal commercial development and government activity that is at the heart of the federal policy of self-determination. *See Bay Mills*, 134 S. Ct. at 2043 (Sotomayor, J., concurring) ("For tribal gaming operations cannot be understood as mere profit-making ventures that are wholly separate from the Tribes' core governmental functions."). Indeed, that distinction flies in the face of congressional pronouncements to the contrary in the IGRA. And, it ignores the fact that the Supreme Court famously rejected a similar distinction in connection with federal regulation of states, characterizing this distinction as unworkable. *Compare Nat'l League of Cities v. Usery*, 426 U.S. 833, 840–52 (1976) (proposing a "traditional governmental functions" standard for state governmental immunity from federal regulation under the Commerce Clause), *with Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 537–47 (1985) (rejecting the "traditional governmental functions" standard as "unsound in principle and unworkable in practice"); *see also Kiowa Tribe of Okla. v. Mfg. Techs., Inc.*, 523 U.S. 751, 758–60 (1998) (declining to draw a distinction between commercial and governmental activities for purposes of tribal sovereign immunity).

Because we do not believe that the *Coeur d'Alene* framework properly addresses inherent tribal sovereignty under governing Supreme Court precedent, we would choose not to adopt that framework here. We would instead employ the fact-intensive analysis dictated in *Montana* and *Hicks* and conclude that the first *Montana* exception bars application of the NLRA to the Casino. And because key aspects of the Tribe's inherent sovereignty would be encroached upon by application of the NLRA to the Casino, we would decline to apply it to the Casino absent an indication of clear congressional intent to do so.

V

Notwithstanding our preferred analytical framework, and in light of our prior panel decision in *Little River*, we are bound to conclude that the NLRA applies to the Soaring Eagle Casino and Resort, and that the Board has jurisdiction over the present dispute. We enter judgment enforcing the Board's order and deny the Tribe's petition for review.

**AFFIRMED**

---

**CONCURRING IN PART AND DISSENTING IN PART**

---

HELENE N. WHITE, Circuit Judge, concurring in part and dissenting in part.  I concur in all but section III(B) of the majority opinion.  I agree that *Little River* was wrongly decided, that *Coeur d'Alene* (the reasoning of which *Little River* adopts) is inconsistent with Supreme Court precedent and premised on inapplicable dictum, and that application of the NLRA to the Tribe is inconsistent with traditional notions of tribal sovereignty.  I dissent because I believe that this case is distinguishable from *Little River* and *Coeur d'Alene* on the basis that the Tribe here has treaty rights protecting its on-reservation activities.

The 1864 Treaty provides that the United States agrees to set aside the reservation land for the Tribe's "exclusive use, ownership, and occupancy."  14 Stat. 657 (1864).  As the majority correctly notes, it is well settled that several interpretive canons inform decision making in this context.  Specifically, it is black-letter law that "we interpret Indian treaties to give effect to the terms as the Indians themselves would have understood them." *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 196 (1999); *Choctaw Nation, et al. v. Oklahoma, et al.*, 397 U.S. 620, 631 (1970) ("[T]reaties were imposed upon [the Indians] and they had no choice but to consent.  As a consequence, [the Supreme] Court has often held that treaties with the Indians must be interpreted as they would have understood them, and any doubtful expressions in them should be resolved in the Indians' favor."  (internal citations omitted)); *Worcester v. Georgia*, 31 U.S. (6 Pet.) 515, 582 (1832) (stating that all that matters is "[h]ow the words of the treaty were understood by [the Indians at the time they entered into the treaty]").  Accordingly, "the language used in treaties with the Indians shall never be construed to their prejudice, if words be made use of which are susceptible of a more extended meaning than their plain import as connected with the tenor of their treaty." *Keweenaw Bay Indian Cmty. v. Naftaly*, 452 F.3d 514, 523 (6th Cir. 2006); *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766 (1985).[1]

---

[1]Of course, "Congress may abrogate Indian treaty rights, but it must clearly express its intent to do so." *Mille Lacs*, 526 U.S. at 202.  This is because "a proper respect both for tribal sovereignty itself and for the plenary authority of Congress in th[e] area [of Indian affairs] cautions that [courts] tread lightly in the absence of clear

The majority does not dispute these canons or how they apply; rather, it finds the Treaty's general right of exclusion insufficiently specific to support the Tribe's claim. True, the Treaty does not expressly state that the NLRA does not apply to the Tribe; nor does it say that federally recognized labor unions cannot solicit on tribal land, or that federal authorities may not enter onto tribal land. But it does not need to.

We must interpret the Treaty the way a member of the Chippewa Tribe would have understood it in 1864. *See Worcester*, 31 U.S. (6 Pet.) at 582; *see also Mille Lacs*, 526 U.S. at 196. As memorialized in the Treaty, in exchange for "relinquishing . . . several townships" to the federal government, the Tribe secured the "exclusive use, ownership, and occupancy" of the remnant it retained. 14 Stat. 657 (1864). Each and every tribal signatory signed with an "X," indicating, if nothing else, that English was not a well-understood language. Surely, these signatories who just gave up a significant portion of their homeland, would not have understood their right to the "exclusive use, ownership, and occupancy" of their remaining land to be limited, non-specific, or subject to regulation regarding the conditions the Tribe might impose on those it permitted to enter. On the contrary, the Tribe would reasonably have understood this provision to mean that the federal government could not dictate, in any way, what the Tribe did on the land it retained. To parse the specificity of the over 150-year-old Treaty to the Tribe's detriment violates recognized canons of interpretation. *See, e.g.*, *Naftaly*, 452 F.3d at 523. To be sure, Congress could have, and can, expressly abrogate this right, *Mille Lacs*, 526 U.S. at 202, but all agree it has not done so.

Absent Congress's express direction to the contrary, the Tribe's treaty-based exclusionary right is sufficient to preclude application of the NLRA to the Tribe's on-reservation Casino. *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130 (1982), is instructive. Although *Merrion* did not involve a treaty, it exhaustively interpreted the same right at issue here: a tribe's right to exclude non-members from tribal lands. *Id*. at 144. As the majority correctly notes, *Merrion* made crystal clear that "[n]onmembers who lawfully enter tribal lands remain subject to the tribe's power to exclude them. This power necessarily includes the lesser power to place conditions on entry, on continued presence, or on reservation conduct. . . ." *Id*. Thus, whether a

---

indications of legislative intent." *Merrion*, 455 U.S. at 149 (quoting *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 60 (1978)). No one suggests that Congress has expressly abrogated the Tribe's treaty rights in the NLRA.

tribe's right of exclusion is found in its inherent sovereignty or its treaty, a tribe with such a right also necessarily has the "lesser power" to place conditions on a non-member's entry. *See id.*; *cf. South Dakota v. Bourland*, 508 U.S. 679, 687–88 (1993) (interpreting a general right of exclusion as "embracing the implicit power to exclude others"); *Montana v. United States*, 450 U.S. 544, 559 (1981) (same). Here, the lesser power to place conditions on a non-member's entry necessarily includes the power to regulate, without federal interference, the non-member's conditions of employment.

That *Little River* and *Coeur d'Alene* relegate tribal sovereign rights of exclusion to history does not justify the abrogation of treaty-based exclusionary rights as well. Here, the Tribe's treaty-based right of exclusion is especially pertinent given that its sovereign powers have been diminished. Indeed, the very purpose of the Treaty was to operate as a bulwark against any erosion of the Tribe's sovereign rights that might otherwise occur. In *Little River* and *Coeur d'Alene*, the tribes' inherent sovereignty was curtailed notwithstanding the absence of express congressional intent to do so. Where those courts derived the right or authority to make such a finding is not apparent in the reasoning of the opinions themselves, nor is it apparent from Supreme Court precedent. In any event, no treaty was involved in those cases and neither court purported to abrogate a tribe's treaty-based rights. Thus, although *Littler River* is controlling as to the sovereignty issue, it has no bearing on the treaty issue.

In sum, I join in the majority's conclusion that *Little River* is wrongly decided but dictates that the Tribe's inherent sovereignty cannot itself carry the day. However, the Tribe's treaty-based exclusionary right does not suffer the same fate. At bottom, the Treaty matters, and to find otherwise suggests that the federal government's agreement with the Tribe is worth no more than the paper on which it was written. It well may be that when a tribe's inherent sovereignty rights are broadly interpreted, its treaty-based exclusionary right (general or specific) has little work to do. But out of necessity, the treaty-based right assumes a paramount role when a tribe's inherent sovereignty has been judicially narrowed, and the treaty should not be narrowly interpreted. Such is the case here, and thus I respectfully dissent from section III(B) of the majority opinion.