RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2002 FED App. 0243P (6th Cir.)
File Name: 02a0243p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

THE PAINTING COMPANY,
                    *Petitioner/*
            *Cross-Respondent,*

            *v.*

NATIONAL LABOR RELATIONS
BOARD,
                    *Respondent/*
            *Cross-Petitioner.*

Nos. 00-1311/1480

On Petition for Review and Cross-Application for
Enforcement of an Order
of the National Labor Relations Board.
Nos. 9-CA-33482; 9-CA-33665-1, -2;
9-CA-33674; 9-CA-33723-1, -2.

Argued: October 31, 2001

Decided and Filed: February 6, 2002[*]

---

[*] This decision was originally issued as an "unpublished decision" filed on February 6, 2002. On June 27, 2002, the court designated the opinion as one recommended for full-text publication.

1

Before:  SILER and COLE, Circuit Judges; STAFFORD,
District Judge.[**]

--------------------

**COUNSEL**

--------------------

**ARGUED:** Bonnie I. O'Neil, THOMSON HINE, Columbus, Ohio, for Petitioner.  Frederick C. Havard, NATIONAL LABOR RELATIONS BOARD, APPELLATE COURT BRANCH, Washington, D.C., for Respondent. **ON BRIEF:** Daniel J. Brake, SCOTT, SCRIVEN & WAHOFF, Columbus, Ohio, for Petitioner.  Frederick C. Havard, Aileen A. Armstrong, Jeffrey Horowitz, NATIONAL LABOR RELATIONS BOARD, APPELLATE COURT BRANCH, Washington, D.C., for Respondent.

--------------------

**OPINION**

--------------------

R. GUY COLE, JR., Circuit Judge.    The Painting Company, a closely held Ohio corporation, appeals a March 23, 2000 Decision and Order of the National Labor Relations Board (the "Board"), which found The Painting Company liable for engaging in several counts of anti-union activity in violation of Sections 8(a)(1) and 8(a)(3) of the National Labor Relations Act (the "NLRA" or the "Act," which corresponds to Sections 158(a)(1) and (3) of Title 29 of the United States Code).    Respondent cross-appeals, seeking enforcement of the Board's decision.    For the following reasons, this Court **ENFORCES** the decision of the Board.

--------------------

[**] The Honorable William Stafford, United States District Judge for the Northern District of Florida, sitting by designation.

is substantial evidence in support of the Board's determination.

To make a *prima facie* case that a layoff was based on protected activity, the General Counsel must prove that "anti-union animus partially motivated or contributed to the decision to lay off. . . ." *W.F. Bolin Co. v. NLRB*, 70 F.3d 863, 871 (6th Cir. 1995). The Board found a *prima facie* case here by concluding that the Four Union Painters were terminated as a result of their efforts to organize the workplace. Both the timing of the layoffs (on the heels of increased pro-union activity) and the particularized nature of the layoffs (of the employees at Franklin Furnace, only the Four Union Painters were laid off) support the Board's conclusion that there was a *prima facie* violation. TPC argues that it had a healthy interaction with unions and did not discriminate on that basis. This argument cannot succeed on appeal because the Board's factual findings were grounded in substantial evidence and, therefore, must be affirmed.

TPC next argues that it successfully rebutted the *prima facie* case because it would have laid off the Four Union Painters in any event under a seniority-based or a status-based layoff policy. The Board's rejection of TPC's argument as pretextual also has a basis in substantial evidence: neither a seniority-based policy nor a status-based policy was fairly applied to the Franklin Furnace project and a seniority-based or a status-based policy had not been applied previously at the Franklin Furnace job site. Based on those factual findings, which are supported by substantial evidence, the Board's decision should not be disturbed.

### III.

Under the standards of review employed here, TPC is unable to sustain any of its assignments of error. Consequently, Petitioner's petition for review is **DENIED**. Respondent's cross-application for enforcement is **GRANTED**; and the Board's decision and order is hereby **ENFORCED**.

### I.

The Painting Company ("TPC") is an interior painting contractor, wholly owned by three brothers who are also officers of the corporation: Jeff Asman (president); Terry Asman (vice president); and David Asman (vice president and secretary). On average, TPC employs thirty to forty painters, but that number is subject to significant fluctuation. Depending on the demand for interior painting, TPC may employ upwards of 50 or as few as 15 painters.

TPC opposes the unionization of its workforce; but, nevertheless, it employs several painters who belong to unions. TPC's workforce as a whole is not unionized and TPC is not a party to a collective bargaining agreement. On at least one occasion, Jeff Asman, president of TPC, publicly stated that TPC would cease to exist if its workforce unionized. Despite this position, TPC does not refrain from hiring union members. Sometimes, it even seeks to hire union painters or invites a union to provide painters. TPC is also aware that its non-union employees often work side by side with union employees and that the employees discuss the advantages of unionization.

TPC's interaction with unions was the subject of hearings in front of the Board. After a hearing by Administrative Law Judge Stephen J. Gross, the Board concluded that TPC engaged in several anti-union activities in violation of the NLRA. TPC appeals the Board's conclusions relating to two factual scenarios: the painting of the Ohio State House and the painting of the Youth Detention Center in Franklin Furnace, Ohio.

#### *Painting the Ohio State House*

The State of Ohio hired Shook Building Group ("SBG") as the general contractor for the refurbishing of the State House. SBG in turn contracted with TPC for most of the painting work. SBG set the hours of work and required that the TPC painters wear hard hats and safety boots. Although TPC preferred that its painters wear white shirts and white overalls,

the only dress code that TPC routinely enforced was its prohibition of clothing with obscene language or images. Several TPC painters wore colored shirts and shirts bearing logos at the State House project and they were neither disciplined for wearing those shirts nor ordered to remove those shirts.

In early 1996, several delays caused by other SBG subcontractors prevented TPC from proceeding on schedule with its painting of the Ohio State House. To timely complete the painting, TPC entered a subcontract agreement with Quality Painting Services ("QPS"), a sole proprietorship owned by Michael Grondon. David Asman explained to Grondon over the phone that he wanted four painters who would wear white shirts, white overalls, work boots, and hard hats. Asman also stated that he anticipated needing QPS painters for two weeks and TPC would pay QPS the prevailing wage as well as an additional mark-up in an unspecified amount. Grondon agreed to all of those terms.

Following his conversation with David Asman, Grondon telephoned four painters: David Dunn, Rena Lawson, Leroy Allen Hunt, and Scott Allen Hunt to inform them that he had work for them. Dunn and Lawson belonged to Painters Local 1275 Union ("Local 1275"). In a meeting later that night at Grondon's house with those four painters, Grondon explained that they were going to work for TPC at the State House; they should report to TPC supervisors; they had to arrive by 7:30 a.m.; they had to wear white pants and white shirts without logos; and they had to each bring a paint brush with them.

The QPS subcontract started off smoothly. The four QPS painters arrived at the State House promptly at the start of work on January 18, 1996, dressed in white shirts and white pants. When they arrived, TPC provided them with the tools and equipment needed for painting, including paint, paint rollers, pushcarts, and drop cloths. TPC also paired each QPS painter with a TPC painter and then directed each pair of painters where to paint. The four QPS painters worked a full ten-hour day at the State House without incident.

agreement with QPS after only two days of performance. The Board also found that as a result of wearing union T-shirts, Dunn and Lawson were dismissed from work on January 19 and the contract with QPS was cancelled by Monday, January 22, 1996. TPC responds that because QPS never had workers' compensation insurance, the termination of the contract was valid. TPC's position would be viable, if Dunn and Lawson were sent home early from work on Monday, the same day that TPC realized that QPS did not have workers' compensation insurance. But, TPC sent Dunn and Lawson home early on Friday, before it knew of QPS's lack of insurance. Because TPC did not have a valid reason for terminating the QPS contract until Monday, Dunn and Lawson can recover compensatory wage payments for their missed work, if any, on Friday.

### E. Asman's Threat to Remove the Union T-Shirt or Leave the Job

The Board concluded that Asman's command that Dunn remove the union T-shirt or leave the job constituted a Section 8(a)(1) violation because it was an unlawful threat of discharge. While TPC disputes the Board's conclusion, it does not offer a cogent reason to support its position. Rather, TPC premises its disagreement solely on its mistaken contention that Dunn was not an employee of TPC or QPS. As discussed above, the Board's factual conclusions that Dunn was not an independent contractor and he was jointly employed by TPC and QPS are supported by substantial evidence. Therefore, the only basis for TPC's appeal of this point has evaporated.

### F. Laying Off the Four Union Painters

Turning to the Franklin Furnace job, TPC appeals the Board's decision because (i) the General Counsel did not meet its burden to lay out a *prima facie* case of anti-union animus and (ii) TPC would have laid off the Four Union Painters regardless of their involvement with protected union activity. TPC's final basis for appeal also fails because there

upon review of the facts, substantial evidence supports the conclusion that Dunn and Lawson were not independent contractors.

## C.  TPC and QPS As Joint Employers

In its next attempt to exclude Dunn and Lawson from coverage under the NLRA, TPC argues that it was not a joint employer with QPS and, therefore, it did not employ Dunn or Lawson. This argument fails.

The legal standard for determining whether a joint employer relationship exists is "where two or more employers exert significant control over the same employees -- where from the evidence it can be shown that they share or co-determine those matters governing essential terms and conditions of employment -- they constitute 'joint employers' within the meaning of the NLRA." *Carrier Corp. v. NLRB*, 768 F.2d 778, 781 (6th Cir. 1985) (quoting *NLRB v. Browning-Ferris Indus. of Pennsylvania, Inc.*, 691 F.2d 1117, 1124 (3d Cir. 1982)). Joint employer status is a factual matter for the Board to decide based on substantial evidence. *See Carrier Corp.*, 768 F.2d at 781.

Although TPC contends that it was not a joint employer of Dunn and Lawson, substantial evidence supports the Board's conclusion that TPC and QPS jointly employed Dunn and Lawson. The Board found that TPC exerted control over Dunn and Lawson by pairing them with TPC employees; by providing every supply needed to do the job; and by making them perform the exact same work as all other TPC employees subject to the same management oversight. In short, this evidence of TPC's control over Dunn and Lawson is substantial and the Board's conclusion that Dunn and Lawson were employed by TPC as well as QPS must be affirmed.

## D.  Termination of the QPS Contract

TPC also challenges the Board's conclusion that TPC engaged in anti-union activity by terminating its subcontractor

The seeds of conflict were planted that day, however. The business manager and an organizer for Local 1275 visited Dunn and Lawson at the State House. Those four met again after work that day and at that time, the Local 1275 business manager requested that Dunn and Lawson assist him in unionizing TPC by wearing union T-shirts to work the next day. Dunn and Lawson agreed to wear the union T-shirts despite Grondon's instruction to wear plain white shirts.

Trouble started the next day. Mid morning, Jeff Asman discovered Lawson and then Dunn wearing union T-shirts and ordered them to remove their shirts immediately. Lawson complied with Asman's demand without much protest. Dunn, on the other hand, did not cooperate. In fact, Asman returned to Dunn's workplace to find that Dunn was still wearing the union T-shirt. At that point, Asman told Dunn to either remove the shirt or leave the job. Dunn still did not take off the shirt. Dunn then called Local 1275 and afterwards spoke with other painters about the incident. Later yet, Asman found Dunn wearing the union T-shirt and talking with the other painters. This time, Dunn told Asman that he had called the union and Asman told Dunn to get back to work.

Early that afternoon, Local 1275 officials arrived at the State House and spoke with Jeff Asman. The Local 1275 officials recorded their conversation with Asman through a concealed tape recorder. During that conversation, Asman brought up TPC's dress code, remarking that the TPC "dress code would be, if we're not union, we can't wear union clothing."

Later that day, Jeff Asman located the four QPS painters and told them that TPC no longer needed QPS as a subcontractor because TPC was on schedule with the painting. Asman told them to stop working and leave the State House work site. At about this same time, Asman telephoned Grondon to cancel the contract because the four men "weren't working out." Asman elaborated that Lawson was sloppy and that Dunn and Lawson wore union T-shirts instead of painters whites. Asman further complained that the

union T-shirt incident led to a confrontation with Local 1275 officials and it caused Dunn to cease painting and instead interrupt other TPC painters. Without TPC's business, QPS terminated the employment of the four painters.

Jeff and David Asman met with Grondon on or about January 22. At the meeting, Grondon signed TPC's standard form contract and TPC paid QPS $1,784.72 -- the wages the four QPS painters earned for 18 hours plus a $200 mark-up. The Asmans also requested that Grondon produce workers' compensation insurance forms, which Ohio law requires of state subcontractors. In violation of Ohio law, QPS did not carry workers' compensation insurance.

Based upon these facts, the Board concluded that TPC violated the NLRA. TPC violated Section 8(a)(1) of the Act because Jeff Asman ordered Dunn and Lawson to remove their union T-shirts while simultaneously permitting other employees to wear colored T-shirts with logos. The Board also concluded that TPC violated Section 8(a)(1) and (3) of the Act by terminating the QPS contract due to Lawson's and Dunn's union activity. Finally, the Board concluded that Jeff Asman's threat to Dunn to either remove the union shirt or leave the job violated Section 8(a)(1) of the Act because it was threat of discharge as a result of protected union activity.

### Painting the Youth Detention Center in Franklin Furnace, Ohio

The second instance of TPC's anti-union activity took place at the Ohio River Valley Youth Detention Center in Franklin Furnace, Ohio, where TPC worked as a painting subcontractor. The TPC supervisor for this job, Larry Courts, had decades of experience as a commercial painter and had occasional interaction with unions, despite having contempt for them. After TPC received the contract to paint the Youth Detention Center, TPC gave its word to Bud Hayslip, the business representative for Painters Local 555 ("Local 555"), which had jurisdiction over Franklin Furnace, that it would hire some Local 555 painters for the job. When Courts needed additional journeymen painters for the Franklin

F.3d 531, 537 (6th Cir. 2000) ("[T]he Board's interpretation of the NLRA must be upheld if reasonably defensible."); *see also Sandusky Mall Co. v. NLRB*, 242 F.3d 682, 690-91 (6th Cir. 2001). Because the *Holly Farms* holding requires that the *Chevron* standard apply only to the Board's interpretations of the NLRA, this Circuit's historical *de novo* review remains in force for the Board's legal conclusions that do not interpret the NLRA. *See Meijer, Inc. v. NLRB*, 130 F.3d 1209, 1212 (6th Cir. 1997) (explaining that the Court will uphold the Board's interpretation of the Act if it is reasonably defensible and the Court will review other questions of law *de novo*).

### B.    Whether Dunn And Lawson Were QPS Employees

TPC argues that Dunn and Lawson cannot recover under the NLRA because they were "independent contractors" who are excluded from protection under the Act. *See* 29 U.S.C. § 152(3) (excluding independent contractors from the Act). In support of its position, TPC contends that under the "right to control test" for determining whether a worker is an employee or an independent contractor, Dunn and Lawson were independent contractors. On appeal, the Board responds that under the right to control test, Dunn and Lawson were not independent contractors, especially because they did not have any meaningful entrepreneurial or proprietary component to their employment.

Deciding whether Dunn and Lawson were independent contractors under the right to control test requires inquiry into the total factual context of employment. *See Aetna Freight Lines, Inc. v. NLRB*, 520 F.2d 928, 930 (6th Cir. 1975). TPC controlled the employment of Dunn and Lawson enough for them to be employees as opposed to independent contractors. TPC determined where they would work; it provided them with the needed tools and equipment, including paint, paint rollers, pushcarts, and drop cloths; and it paired them with TPC painters for supervision. Moreover, neither Dunn nor Lawson exhibited any meaningful entrepreneurial or proprietary characteristics that would lead one to believe that they controlled the terms of the work they completed. In sum,

inferences and credibility determinations, even if we would conclude differently under *de novo* review. *See ITT Auto.*, 188 F.3d at 384; *Kentucky May*, 89 F.3d at 1241; *NLRB v. Mead Corp.* 73 F.3d 74, 78 (6th Cir. 1996); *see also NLRB v. Taylor Mach. Prods. Inc.*, 136 F.3d 507, 514 (6th Cir. 1998) ("We afford even more deference to Board determinations of credibility and will not normally set aside the Board's choice between conflicting testimony.").

This Circuit follows two separate standards for reviewing the Board's decisions on questions of law: the Court engages in the deferential *Chevron* review when the Board interprets the NLRA and the Court reviews the Board's legal conclusion *de novo* when an interpretation of the NLRA is not at issue. The Board's interpretations of the NLRA should be reviewed according to the two-step process articulated in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-43 (1984). *Holly Farms Corp. v. NLRB*, 517 U.S. 392, 398-99 (1996); *see also NLRB v. Webcor Packaging, Inc*, 118 F.3d 1115, 1119 (6th Cir. 1997) ("Holly Farms establishes the standard of review now binding on the courts of appeals in reviewing the NLRB's interpretation of the relevant provisions of the NLRA."). Under the *Chevron* standard of review, the Court first asks "whether Congress has directly spoken to the precise question at issue." *Chevron*, 467 U.S. at 842; *Webcor*, 118 F.3d at 1119. If Congress has directly addressed the issue, then the Court must give effect to that expression of congressional will. *Chevron*, 467 U.S. at 842-43; *Webcor*, 118 F.3d at 1119. If Congress has not directly spoken on the precise question at issue, the Court reviews the Board's decision solely to assess whether the Board's interpretation is based on a permissible interpretation of the statute. *Chevron*, 467 U.S. at 843; *Webcor*, 118 F.3d at 1119. Under this standard, the Board's reading of the statute need only be reasonable; it need not be the best interpretation. *See Holly Farms*, 517 U.S. at 409 ("For the Board to prevail, it need not show that its construction is the *best* way to read the statute; rather, courts must respect the Board's judgment so long as its reading is a reasonable one."); *NLRB v. Main St. Terrace Care Ctr.*, 218

Furnace site, he hired four union painters: Charles Crisp, Warren Hull, Robert Meade, and Mark Pratt (collectively, the "Four Union Painters"), whom he had mistakenly assumed were either members of Local 555 or members of a foreign union who had received consent from Hayslip to accept the job.

The Four Union Painters began work on December 4, 1995. Shortly after their arrival, they began to discuss the advantages of union membership among themselves and with other TPC painters. Courts heard these conversations and made no effort to silence them. Also, not long into the project, Courts formed opinions of each of their painting skills. Courts believed that Crisp, Hull, and Pratt were sub-par painters and he began criticizing their work. In contrast, Courts respected Meade's work and thought that Meade was an outstanding painter. Despite his differing assessments of the Four Union Painters, Courts did not discriminate between them when he was assigning work.

In their second week of work, the Four Union Painters learned that TPC needed them to work the weekend of December 16 and 17. Meade asked Courts about the consequences of not accepting that assignment and Courts stated that there was a "damn good possibility" that the Four Union Painters would lose their jobs if they did not work that weekend.

At the close of work on Friday, December 15, each of the Four Union Painters handed Courts a letter from the business agent for the Tri-State Building and Construction Trades Council. The letters stated that each of the Four Union Painters was organizing union activity at the Franklin Furnace site. Courts read the letters and then said that he would deliver them to Jeff Asman so that Asman could "wipe his ass on them." After reading the letters, Asman and Courts realized for the first time that the Four Union Painters did not belong to Local 555 and that hiring them without informing Hayslip could adversely affect TPC's relationship with Hayslip.

From that point on, tensions grew between TPC and the Four Union Painters. The Four Union Painters did not work the weekend of December 16 and 17. Also, the following Monday, the Four Union Painters began distributing pro-union materials to the other six TPC painters at the Franklin Furnace site. The next week, the business manager of Painters Local 1072 asked Courts if he could speak to the TPC employees at the Franklin Furnace site. Courts consented. On December 26, the Local 1072 business manager distributed pro-union materials and told the employees to contact him with any work problems that they may have. Although the painters did little more than listen to the presentation, Courts interjected at one point that the union had previously "screwed" him. The next day, Courts came down with pneumonia and was out sick the rest of the week. On that same day, TPC received a letter from Local 1072 protesting that the Four Union Painters were not being paid at the appropriate rate for journeymen. On December 28, the Local 1072 business manager and Hayslip visited the Franklin Furnace site to speak to painters about the benefits of union membership.

Things changed in the new year. On the first working day, January 2, 1996, Courts returned to work and laid off the Four Union Painters upon their arrival at work. Courts justified the lay-offs on the grounds that work was slowing down from other TPC projects and more senior employees, who had eleven, ten, six, and five years of experience, would be taking the Four Union Painters' place. Courts did not lay off any other employees. After laying off the Four Union Painters, Courts called TPC's office to suggest that TPC find work on another project for the Four Union Painters. Despite his request, TPC never again hired the Four Union Painters.

The Board did not believe Courts's explanation for laying off the Four Union Painters. There was no evidence that TPC had a seniority-based or a status-based lay-off policy in general or at the Franklin Furnace site. Nor did the Board believe the explanation that TPC's seniority system required laying off the Four Union Painters. Moreover, under the

Board's seniority analysis, neither the non-union TPC painters at Franklin Furnace who retained their jobs nor the eleven painters transferred to the Franklin Furnace site between January 2 and 15 were uniformly senior to the Four Union Painters.

In light of the Board's finding that Courts's explanation for the layoffs was "demonstrably false," the Board concluded that the real reason for the layoffs was the Four Union Painters' union membership and activities. The Board rejected TPC's attempt to rebut this conclusion through a showing that the Four Union Painters would have been laid off anyway for performance reasons. As a result of these findings, the Board ordered that TPC reinstate the Four Union Painters and compensate them for their loss of earnings and benefits.

## II.

### A. Standard of Review for NLRB Decisions

The Sixth Circuit applies different standards of review to different components of the Board's decisions. It is well established that we review the Board's factual determinations as well as the Board's application of law to a particular set of facts under a substantial evidence standard. *See ITT Auto. v. NLRB*, 188 F.3d 375, 384 (6th Cir. 1999); *W.F. Bolin Co. v. NLRB*, 70 F.3d 863, 870 (6th Cir. 1995). Under that standard, the Board's decisions must be supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion" and "a mere scintilla of evidence" will not suffice to satisfy this standard. *ITT Auto.*, 188 F.3d at 384 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The substantial evidence standard is a lower standard than weight of the evidence and "'the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence.'" *NLRB v. Kentucky May Coal Co., Inc.*, 89 F.3d 1235, 1241 (6th Cir. 1996) (quoting *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966)). Also, under this standard, we defer to the Board's reasonable