RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 20a0111p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED AUTOMOBILE, AEROSPACE AND
AGRICULTURAL IMPLEMENT WORKERS OF AMERICA,
LOCAL 600, AFL-CIO,

> *Petitioner/Cross-Respondent,*

> *v.*

Nos. 19-2033/2168

NATIONAL LABOR RELATIONS BOARD,

> *Respondent/Cross-Petitioner,*

LLOYD STONER,

> *Intervenor.*

On Petition for Review and Cross-Application for Enforcement
of an Order of the National Labor Relations Board;
No. 07-CB-221096.

Decided and Filed:  April 13, 2020

Before: SUHRHEINRICH, BUSH, and MURPHY, Circuit Judges.

_____

**COUNSEL**

**ON BRIEF:**  Seth Matus, MATUS LAW OFFICE, P.C., Naperville, Illinois, James R. Andary,
ANDARY LAW GROUP, Mt. Clemons, Michigan, for Petitioner/Cross-Respondent.  Usha
Dheenan, Brady Francisco-FitzMaurice, David Habensreit, NATIONAL LABOR RELATIONS
BOARD, Washington, D.C., for Respondent/Cross-Petitioner.  Alyssa K. Hazelwood, Glenn M.
Taubman, NATIONAL RIGHT TO WORK LEGAL DEFENSE FOUNDATION, INC.,
Springfield, Virginia, for Intervenor.

———————————

**OPINION**

———————————

SUHRHEINRICH, Circuit Judge.  After paying union dues for twenty-four years to UAW Local 600 ("Union"), Lloyd Stoner ("Stoner") decided in February 2018 to resign from the Union.[1]  The Union failed to promptly notify Stoner's employer, Ford Motor Company ("Ford"), allegedly due to a clerical error.  Ford therefore continued to deduct dues from Stoner's paycheck for two months and remit them to the Union.  This prompted Stoner to file an unfair labor practice charge with the National Labor Relations Board ("Board").  The Board held that the Union's failure to promptly process Stoner's resignation of union membership violated Section 8(b)(1)(a) of the National Labor Relations Act, 29 U.S.C. §§ 151–169 (the "Act"), in two ways: first, by "restraining" Stoner's right to withdraw from the Union, and, second, by breaching the Union's duty of "fair representation."  The Union has filed a petition for review of that decision, and the Board has filed a cross-application for enforcement.

**I.**

The Union represents a bargaining unit of employees at Ford's Dearborn, Michigan facility.  Ford is authorized by the parties' collective bargaining agreement ("CBA") to withhold union membership dues and transmit them to the union if an employee joins the union and signs a dues checkoff authorization form.  Resignation of union membership does not extinguish the dues checkoff authorization; the CBA requires the employee to revoke a checkoff authorization within a specified window, although it is undisputed that the Union did not enforce those restrictions.  To resign union membership, a bargaining unit employee is required to send a signed letter to the Union's financial secretary, Mark DePaoli ("DePaoli").  DePaoli would then notify Ford's human resources manager at the Dearborn facility to stop deducting union dues from the employee's paycheck.

———————————

[1]Michigan is a right-to-work state.

In February 2018, Stoner left DePaoli several voicemail messages notifying him that he wished to resign from the Union and requested a copy of his checkoff authorization card. DePaoli returned Stoner's phone call and on March 5 emailed the authorization form to Stoner.

On March 9 Stoner sent a letter by certified mail stating that he was resigning from the Union "effective immediately" and revoking his dues checkoff authorization. The Union received Stoner's letter on March 12. That same day, DePaoli drafted a letter instructing Ford's human resource manager to stop deducting dues from Stoner's paycheck (the "notification letter"). However, DePaoli testified that he did not know whether he actually emailed the letter to his secretary for printing on Union letterhead, as was his custom. DePaoli explained that "there was a lot going on" at the time because he was in "some negotiations" and also that he had a temporary secretary.

On March 19 Ford notified Stoner that it would continue deducting dues because it had not received a timely revocation of his checkoff authorization. Ford deducted Stoner's dues until mid-June. Stoner reacted by filing an unfair labor practice charge with the Board on May 29 alleging that the Union violated the Act by failing to process his resignation and revocation and by continuing to accept dues deducted from his wages.

On June 1 after receiving Stoner's charge from the Board, DePaoli sent a letter (the one he had drafted on March 12) to Ford telling the company to immediately cease deducting union dues from Stoner's pay (but DePaoli did not notify Stoner that he had sent the letter). The Union accepted the last of Stoner's dues on June 4 and 8. It did not return any of the funds, however.

On August 16, DePaoli sent Stoner the following letter:

> Based on your recent charges filed through the NLRB, it appears that Ford Motor Company is still deducting union dues from your wages. Unfortunately, we have to wait for the company to send us a report of all the dues deducted each month, and currently we only have records through June. If you had contacted me, as you did so many times in the past when you wanted a copy of your dues check off authorization card, I could've resolved the issue by getting copies of your check stubs that show the amount of dues deducted, and I could've reimbursed you within a week. This current process takes much longer. Here is what our records show and what I am authorized to reimburse at this time:

| | |
|---|---|
| April - | $75.25 |
| May - | $75.25 |
| June - | $66.75 |
| TOTAL - | $217.25 |

Should Ford Motor Company deduct any further dues, you can contact me for prompt reimbursement, or you can continue to contact the NLRB and they will let me know.

DePaoli enclosed a check for $217.25. The amount actually owed was $247.35.

On August 23, the Board's General Counsel issued an unfair labor practice complaint alleging that the Union violated Section 8(b)(1)(A) when it restrained or coerced Stoner in the exercise of his Section 7 right to refrain from joining or assisting a labor organization by failing to promptly process his resignation and revocation of dues authorization. The Board further alleged that the Union violated Section 8(b)(1)(A) by breaching its duty of fair representation. The complaint also asserted that the Union violated Section 8(b)(2) by causing Ford to deduct Stoner's dues after he had revoked authorization.

After an evidentiary hearing, an administrative law judge ("ALJ") held that the Union had committed all three violations. First, the ALJ found as a factual matter that DePaoli's explanation that he forwarded a draft of his March 12 letter to his secretary for printing "was not credible," because "there was no evidence that he emailed his March 12 draft" to the secretary. The ALJ stated that "DePaoli provided a vague and less than credible explanation attributing the delay in responding to Stoner's resignation to various union activities and staffing issues." Therefore, the ALJ ruled that even if DePaoli's failure to process the resignation and revocation had been inadvertent, a clerical error is not a defense to a violation of Section 8(b)(1)(A) of the Act, based on the Board's ruling in *Walt Disney Parks & Resorts U.S., Inc.*, 366 N.L.R.B. No. 96, slip op. at 2 n.4 (June 20, 2018). The ALJ also found that the Union delayed processing Stoner's resignation and revocation until after he had filed an unfair labor practice charge, issued only a partial refund, and "excoriated Stoner for exercising his Section 7 rights."

Next, the ALJ held that the Union breached its duty of fair representation to Stoner by "intentionally ignoring Stoner's resignation for over two and one-half months, and by responding reproachfully after learning that he had filed this unfair labor practice charge." Finally, the ALJ

found that DePaoli's delay violated Section 8(b)(2) of the Act based on "the reasonable inference [DePaoli] drafted the applicable notification to Ford and then decided to sit on it for a while."

For the reasons stated by the ALJ, the Board agreed that the Union's "failure to promptly process Stoner's resignation of union membership and revocation of dues checkoff authorization coerced Stoner, and constituted a breach of its duty of fair representation, in violation of Sec. 8(b)(1)(A) of the Act." It reversed the ALJ's Section 8(b)(2) ruling because the Union's inaction was not an "affirmative act" as required by that section. The Board ordered the Union to: (1) honor Stoner's resignation request and revoke his dues checkoff authorization; (2) reimburse Stoner for the improperly deducted dues with interest; (3) give the Board the records relevant to the backpay due Stoner; and (4) provide notice to all union members at Ford's Dearborn facility.

The Union has filed a petition for review. The Board has filed a cross-application to enforce its decision and order. Charging Party Stoner intervened in support of the Board's decision.

## II.

The Board's interpretation of the Act is entitled to deference. *Painting Co. v. NLRB*, 298 F.3d 492, 499 (6th Cir. 2002). "The Board's construction of the Act is permissible where it does not 'exceed the reach' of the Act." *Meijer, Inc. v. NLRB*, 463 F.3d 534, 539 (6th Cir. 2006) (quoting *NLRB v. J. Weingarten, Inc.*, 420 U.S. 251, 266–67 (1975)). "The judicial role is narrow: The rule which the Board adopts is judicially reviewable for consistency with the Act, and for rationality, but if it satisfies those criteria, the Board's application of the rule, if supported by substantial evidence on the record as a whole, must be enforced." *Id.* (quoting *Beth Israel Hosp. v. NLRB*, 437 U.S. 483, 501 (1984)). However, if the Board "errs in determining the proper legal standard, we may refuse enforcement on the grounds that the order has no reasonable basis in law." *Pleasantview Nursing Home, Inc. v. NLRB*, 351 F.3d 747, 752 (6th Cir. 2003) (quoting *NLRB v. Good Shepard Home*, 145 F.3d 814, 816 (6th Cir. 1998)).

The Board's factual findings are conclusive if supported by "substantial evidence on the record considered as a whole." 29 U.S.C. § 160(f). The Board's application of law to the facts is also reviewed under a substantial evidence standard of review. *Id.* Substantial evidence is "such

relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951) (internal quotation omitted); *Painting Co.*, 298 F.3d at 499. "[U]nder this standard, we defer to the Board's reasonable inferences and credibility determinations, even if we would conclude differently under de novo review." *Id.* (citations omitted). Witness credibility determinations are the Board's bailiwick and receive even more deference. *NLRB v. Galicks, Inc.*, 671 F.3d 602, 607 (6th Cir. 2012) (citing *NLRB v. Taylor Mach. Prods., Inc.*, 136 F.3d 507, 514 (6th Cir. 1998)).

**III.**

**A.**

Section 7 of the Act guarantees employees' rights to "join . . . or assist labor organizations . . . and . . . to refrain from . . . such activities." 29 U.S.C. § 157. Section 8(b)(1)(A) protects those rights by prohibiting unions from "restrain[ing]" or "coerc[ing]" employees in the exercise of Section 7 rights. 29 U.S.C. § 158(b)(1)(A). *See Pattern Makers' League v. NLRB*, 473 U.S. 95, 100 (1985); *see also Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. NLRB*, 844 F.3d 590, 602 (6th Cir. 2016) (stating that "[u]nder Section 8(b)(1)(A), it is an unfair labor practice for a labor organization to 'restrain or coerce' employees in exercising their Section 7 rights"). The Act's guarantee of "voluntary unionism" encompasses the right to resign union membership, *see Pattern Makers' League*, 473 U.S. at 106–07; *Neufeld Porsche-Audi*, 270 N.L.R.B. 1330 (1984), as well as to revoke a dues checkoff authorization, *see Atlanta Printing Specialties*, 215 N.L.R.B. 237, 240 (1974) (holding that a union's failure to process an employee's revocation of dues authorization violated Section 8(b)(1)(A)), *enforced*, 523 F.2d 783 (5th Cir. 1975).

The Board held that the Union violated 8(b)(1)(A) even though the delay in processing Stoner's resignation and revocation was allegedly inadvertent. Relying on the *Walt Disney* case, the Board concluded that "intent is not a required element of an 8(b)(1)(A) violation." The Union counters that *Walt Disney* did not eliminate an intent requirement. We agree with the Union.

In *Walt Disney*, the Board affirmed an administrative law judge's conclusion that Disney violated Section 8(b)(1)(A) by failing to process dues checkoff authorizations revocations of eight union employees and failing to honor union membership resignation requests for seven employees. The Board held that

> [b]ased on the [administrative law] judge's factual findings that the [union] *repeatedly and deliberately* failed to respond in any matter to the Charging Parties' letters, telephone calls, and/or in-person inquiries regarding revocation of their dues checkoff authorizations, we affirm his conclusions that the [union] violated Section 8(b)(1)(A) by restraining and coercing the Charging Parties in the exercise of the rights guaranteed them by Section 7 of the Act.

*Walt Disney,* slip op. at 1–2 (emphasis added). The administrative law judge, in turn found that

> [t]he Charging Parties made multiple attempts to resign, revoke their dues check-off authorizations and/or get the information necessary to submit timely revocations. *Some of their requests were timely; some fell outside the annual revocation window period.* However, the [union] by [the union president] and other union employees, failed time and again to respond to their requests, or if they did respond, did so only after the employees' window periods closed or charges were filed.

*Id.* at 15 (emphasis added). All three Board members found it unnecessary to conduct a duty of fair representation analysis (two members as to all eight charging parties; one member as to two employees) because the union's denial of the employees' request to revoke their dues checkoff authorization restrained and coerced the employees in exercise of Section 7 rights. *Id.* at 2 n.4.

Notwithstanding the foregoing, the Board compares Stoner to one of the eight Charging Parties in *Walt Disney*, Hector Santana-Quintana. Santana-Quintana *timely* resigned and revoked his checkoff, but the union failed to honor his resignation and revocation and continued to deduct dues from his wages. *Id.* slip op. at 7. Santana-Quintana filed an unfair labor practice charge. "[C]laiming that it simply made a clerical error"—i.e. misfiled Santana-Quintana's letter—the union provided a full refund. *Id.* at 14. From these facts, the Board argues that the ALJ correctly concluded that *Walt Disney* stands for the proposition that inadvertence does not excuse a Section 8(b)(1)(A) unfair labor practice.

Problem is, neither the administrative law judge nor the Board in *Walt Disney* made a factual finding that the union's conduct towards Santana-Quintana was "inadvertent." Rather,

both the administrative law judge and the Board inferred intentional misconduct from the union's "repeated and deliberate" disregard of resignation and revocation requests, some timely, some untimely, as to all eight of the Charging Parties.  Thus, the Board's citation of footnote 4 as "holding that a union violated Section 8(b)(1)(A) by failing to timely revoke a dues check-off because the employee's revocation letter was misfiled," is more than a stretch.  *Walt Disney* simply does not support the proposition that inadvertence or negligent conduct violates Section 8(b)(1)(A).

*Affiliated Food Stores*, 303 N.L.R.B. 40 (1991) and *Lockheed Space Operations*, 302 N.L.R.B. 322 (1991) also do not support the Board's ruling.  In *Affiliated Food Stores*, the Board affirmed the administrative law judge's finding that the union violated Section 8(b)(1)(A) by "refusing" to process an employee's revocation of dues and by "instructing" the employer to continue making the deductions.  *Affiliated Food Stores*, 303 N.L.R.B. at 40, 41.  In *Lockheed*, the union "did not accept [the employee's membership resignation and dues revocation] letter as effecting a valid resignation."  *Lockheed*, 302 N.L.R.B. 322–23.  Union negligence was not at issue in either case because the union had knowledge of the employee's requests.[2]

The Board's ruling that inadvertent conduct can amount to "restraint" or "coercion" under Section 8(b)(1)(A) is also inconsistent with this court's interpretations of the Act.  This court has repeatedly held that knowledge of an employee's protected activities and an action motivated by that knowledge are essential elements of a Section 8(b)(1)(A) claim or the analogous Section 8(a)(1) claim against an employer.[3]  *See NLRB v. Int'l Bhd. of Elec. Workers, Local 429*, 514 F.3d 646, 649 (6th Cir. 2008) (holding that the Board has initial burden of

---

[2]The Board has concluded on other occasions that a union's inadvertent error did not violate Section 8(b)(1)(A).  *See Aycock, Inc.*, 282 N.L.R.B. 1228, 1232 (1987) (holding that the union's "honest mistake" in placing a member on the bottom of a hiring list upon the mistaken belief that he had quit his job did not violate the Act); *see also Jacoby v. NLRB*, 325 F.3d 301, 305 (D.C. Cir. 2003) ("upholding the Board's decision that the Union's mistake [in failing to refer a member to a job based on an undisputed mistake] did not amount to a violation of the [Act] or result in a breach of the DFR"; and that "the Union's single mistake in managing its hiring hall did not begin to approach conduct that is proscribed by § 8(b)(1)(A) and § 8(b)(2)").  The Board claims that these cases are not relevant because they involve hiring halls, and mistakes in that setting do not send a coercive message regarding union membership.  We fail to see a meaningful distinction.

[3]Section 8(a)(1) makes it unfair labor practice for an employer "to interfere with, restrain, or coerce" employees exercising their Section 7 rights.  Section 8(b)(1) makes it an unfair labor practice for a union "to restrain or coerce" employees exercising those same rights.  *See* 29 U.S.C. § 158(a)(1), (b)(1).

showing that protected conduct was a "motivating factor" in the union's discrimination against an employee in violation of § 8(b)(1)(A)); *Meijer*, 463 F.3d at 542 (holding that "an employer's knowledge is an element of a § 8(a)(1) violation"; abrogating a Board rule that eliminated a subjective component); *Jim Causley Pontiac v. NLRB*, 675 F.2d 125, 127 (6th Cir. 1982) (stating that "[t]he Board cannot predicate liability on a negligence standard since the purpose of the Act is to protect concerted activity not punish employer ignorance").

In sum, because the Board's ruling that inadvertent error can constitute an unfair labor practice under Section 8(b)(1)(A) "'exceed[s] the reach' of the Act," *see Meijer*, 463 F.3d at 539 (citation omitted), and "has no reasonable basis in law," *see Pleasantview*, 351 F.3d at 752 (citation omitted), we decline to enforce this aspect of the Board's order. This is a pyrrhic victory for the Union, however, as we discuss next.

**B.**

A union is also obligated "to represent all members fairly." *Marquez v. Screen Actors Guild*, 525 U.S. 33, 44 (1998) (citation omitted). The Supreme Court has folded this duty of fair representation into the framework of the Act. *See Int'l Union*, 844 F.3d at 602 (stating that "[w]ithin the framework of the NLRA, the Supreme Court has found that unions have an implied duty of fair representation to their members"). Thus, a breach of this duty of fair representation interferes with Section 7 rights and constitutes a violation of Section 8(b)(1)(A). To prove that a union breached its duty of fair representation, a member must prove that the union's conduct was "arbitrary, discriminatory, or in bad faith." *Vaca v. Sipes*, 386 U.S. 171, 190 (1967).[4] A union's actions are arbitrary if they are "so far outside a wide range of reasonableness as to be irrational." *Ohlendorf v. United Food & Commer. Workers Int'l Union, Local 876*, 883 F.3d 636, 644 (6th Cir. 2018) (quoting *Air Line Pilots Ass'n, Int'l v. O'Neill*, 499 U.S. 65, 67 (1991)). Bad faith requires proof that "the union acted with improper intent, purpose, or motive encompassing fraud, dishonesty, or other intentionally misleading conduct." *Id*. Mere negligence does not state a claim for breach of the duty of fair representation. *See United Steelworkers of Am. v. Rawson*, 495 U.S. 362, 372–73 (1990); *Int'l Union*, 844 F.3d at 603–05.

---

[4]Discrimination is not at issue.

The Union asserts that the "only evidence" to support the Board's ruling that it violated the duty of fair representation was:

> (1) [the Union's] delay in notifying Ford that it should stop withholding dues from Stoner's paychecks[;] (2) its acceptance of dues paid by Ford ostensibly on Stoner's behalf after his dues revocation; (3) [the Union's] failure to contact Stoner when it sent the letter instructing Ford to halt dues deductions from Stoner's paychecks; (4) its delay in refunding the amounts that had been withheld from Stoner's paychecks after his membership resignation[;] and (5) the letter from DePaoli to Stoner that the ALJ characterized as "excoriating."

The Union claims that this evidence fails to show "anything other than inadvertence," and therefore, does not establish substantial evidence of an improper motive.

However, the Board interpreted these facts differently. In particular, the Board adopted the ALJ's determination that DePaoli's explanations for failing to notify Ford that Stoner withdrew from the Union were "vague and less than credible." Based on that determination, the Board inferred that the Union intentionally ignored Stoner's resignation and revocation requests. The Union claims that this credibility determination is unreasonable because DePaoli was helpful in the run-up to Stoner's resignation request and he drafted the notification letter the same day he received Stoner's resignation. Thus, according to the Union, "[i]t is contrary to common sense" to think that "DePaoli either suddenly formed or always had an intent to ignore Stoner or to not transmit the letter." That's one way of looking at it. But the Board perceived the situation differently, drawing the inference that, after drafting the notification letter, DePaoli "then decided to sit on it for a while."[5] Because one could reasonably reject DePaoli's explanation that administrative shuffling caused him to break from his routine practice of emailing revocation letters to his assistant for processing as soon as he completed them, we must affirm the Board's decision. *See Galicks*, 671 F.3d at 607 (noting that "we must defer to the Board's reasonable inferences and credibility determinations, 'even if we would conclude differently under de novo review'") (quoting *FiveCAP, Inc. v. NLRB*, 294 F.3d 768, 776 (6th Cir. 2002)).

---

[5]This factual finding is found in the ALJ's Section 8(b)(2) analysis. Although the Board held that the Union's inaction did not constitute a violation of Section 8(b)(2), it did so on legal grounds only and did not disturb any of the ALJ's factual findings. We therefore agree with the Board that it is "analytically inseparable" from the ALJ's finding that the Union "intentionally ignor[ed]" Stoner's resignation and revocation in the duty of fair representation analysis.

The Board further found that the Union breached its duty of fair representation by "responding reproachfully" after it received the unfair labor practice charge from the Board. According to the Board, it did so by waiting an additional three months to issue a partial refund, and "excoriating" Stoner in the process. The Union blames the delay on Ford's bookkeeping and argues that its August 16 letter was "innocuous" because it merely explained how DePaoli computed Stoner's refund and offered a suggestion "that the matter could have been resolved more expeditiously if Stoner had simply contacted him." But the August 16 letter equally lends itself to a less benign message. Two comments tip the balance from neutral to noxious: First, DePaoli's statement that, "[i]f you had contacted me, as you did so many times in the past, . . . I could've reimbursed you within a week." Second, DePaoli's comment that if Ford deducted any further dues, "you can contact me for prompt reimbursement, or you can continue to contact the NLRB and they will let me know." As the Board points out, these statements could be read as sending the message that members who exercise their right to contact the Board will be punished with delay. The first is mildly intimidating, the second is snotty. Together they create an impression of ill will or intent toward Stoner for exercising his Section 7 rights, and therefore, support the Board's finding that the Union's conduct toward Stoner was in bad faith.[6] This supports its finding of a violation of the Union's duty of fair representation.

## C.

Several sundry arguments by the Union merit brief attention. First, contrary to the Union's assertion, the Board did not apply a diluted duty of fair representation standard by removing the intent requirement from the duty of fair representation analysis. In fact, the Board stated that, "Local 600 breached its duty of fair representation in violation of Section 8(b)(1)(A) by intentionally ignoring Stoner's resignation and revocation requests for over two and one-half months." Its comment that "intent is not a required element of an 8(b)(1)(A) violation" was confined to the independent unfair labor practice claim.

Next, the Union claims that Stoner was required to mitigate his damages, relying on *Eichelberger v. NLRB*, 765 F.2d 851, 857 (9th Cir. 1985). In that case, the Ninth Circuit held

---

[6]*Hendrickson USA, LLC v. NLRB*, 932 F.3d 465, 470 (6th Cir. 2019) is not applicable here. That case turned on Section 8(c) of the Act, which is not at issue in this case, and is distinguishable on its facts.

that the union did not breach its duty of fair representation where the union steward "was nothing more than merely negligent in his handling of [the union member's] purported grievance," in part because the union member knew when the grievance period expired and failed to contact the steward until well after the deadline date. *Id.* The court agreed with the Board's observation that the member "must bear some responsibility for sleeping on her rights." *Id.* at 856. Apart from the fact that the Board here found more than "mere negligence" by the Union, such a demanding standard is at odds with the core purpose of the duty of fair representation, to "st[and] as a bulwark to prevent arbitrary union conduct against individuals stripped of traditional forms of redress by the provisions of federal labor law." *Vaca*, 386 U.S. at 190.

Finally, we reject the Union's argument that the Board ignored evidence that: (1) DePaoli answered Stoner's questions about resigning before Stoner submitted his written request; (2) DePaoli promptly drafted the notification letter; and (3) DePaoli was unaware that dues continued to be deducted after Stoner revoked authorization. The Board not only noted the evidence, but also put a different spin on it, consistent with its finding that the Union breached its duty of fair representation. First, the Board noted that DePaoli returned Stoner's phone call and emailed him his dues checkoff authorization card, but only after Stoner had left "several voicemail messages." Second, the Board found that "DePaoli drafted a letter but did not email it to his assistant for printing." Third, the Board implicitly concluded that DePaoli knew dues continued to be deducted because he intentionally did not send the notification letter until after Stoner filed the unfair labor charge.

Accordingly, we grant the Board's request to enforce and affirm that portion of the order holding that the Union violated its duty of fair representation.

**IV.**

For the reasons stated above, we **GRANT** in part the Union's petition relating to the unfair labor charge; we also **GRANT** in part the Board's cross-petition and **ENFORCE** that portion of the Board's decision holding that the Union breached its duty of fair representation.